J-A08037-17

2017 PA Super 118

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
RUDOLPH MCGRIFF :
:
Appellant : No. 9 EDA 2016

Appeal from the Judgment of Sentence July 1, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002445-2014

BEFORE:   PANELLA, LAZARUS, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED APRIL 21, 2017**

Rudolph McGriff (hereinafter "Appellant") appeals the judgment of
sentence entered in the Court of Common Pleas of Philadelphia County on
July 1, 2015, at which time he was sentenced to life imprisonment without
the possibility of parole following his conviction of first-degree murder along
with concurrent prison terms of two and one half (2 ½) years to five (5)
years for his related firearms convictions.   We affirm.

Appellant was convicted of murdering his estranged girlfriend
(hereinafter "the victim").   As the trial court set forth a comprehensive
recitation of the facts developed at trial in its Pa.R.A.P. 1925(a) Opinion, we

_____

[*] Former Justice specially assigned to the Superior Court.

will not duplicate it herein but, instead, adopt the trial court's summary for purposes of this appeal. **See** Trial Court Opinion, filed 4/5/16, at 2-48.[1]

On July 1, 2015, the jury found defendant guilty of First-Degree Murder, Firearms not to be carried without a license, Carrying firearms on public streets in Philadelphia, and Possessing instruments of crime,[2] and the trial court sentenced Appellant to an aggregate term of life imprisonment. N.T., 7/1/15, 9, 16-17. Appellant filed a post-sentence motion on July 6, 2015, and the trial court denied the same on December 1, 2015.

On December 22, 2015, Appellant filed a timely notice of appeal. On January 12, 2016, the trial court ordered Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b), and Appellant complied on February 10, 2016. In his brief, Appellant presents the following Statement of the Questions Involved:

> 1. Did the trial court abuse its discretion in permitting the prosecutor to present evidence that [ ] Appellant had repeatedly refused to come in to the police office and talk to the detectives who were investigating the homicide in this case while at the same time prohibiting the defense from presenting the testimony of [ ] Appellant's attorney, Anthony Petrone, Esquire, who had instructed [ ] Appellant not to talk to the police?
>
> 2. Did the trial court abuse its discretion in refusing to permit the defense to call witnesses to inform the jury that the victim may have

_____

[1] We direct the parties to attach a copy of the trial court opinion in the event of further proceedings in this matter.

[2] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, 907(a), respectively.

been slain in response to her participation in a scheme of armed robberies at that location?

Brief for Appellant at 3.

Appellant's first issue as it is developed in his appellate brief requires a threefold analysis. Appellant first asserts the trial court denied him his federal and state constitutional rights to due process and a fair trial when it erroneously permitted the prosecution to elicit repeatedly that Appellant had failed to meet with detectives of the Philadelphia Police Department Homicide Unit.

Before we address the merits of this portion of Appellant's initial claim, we first must determine whether Appellant properly has preserved the issue for our consideration, for it is well-settled that a party must make a timely and specific objection at trial, and the failure to do so results in waiver of that issue on appeal. Pa.R.A.P. 302(a); *see also Commonwealth v. Montalvo*, 641 A.2d 1176, 1184 (Pa.Super. 1994) (citation omitted) (to preserve an issue for review, a party must make a timely and specific objection at trial, for this Court will not consider claim on appeal not called to trial court's attention at a time purported error could have been corrected).

Pa.R.E. 103 addresses rulings on evidence and requires a contemporaneous objection in order to preserve a claim of error in the admission of evidence. The Rule reads in relevant part as follows:

> **(a)  Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only:

       (1) if the ruling admits evidence, a party, on the record:
          (A) makes a timely objection, motion to strike, or motion *in limine*; and
          (B) states the specific ground, unless it was apparent from the context. . . .

Pa.R.E. 103(a). "Consistent with ... Pa.R.E. 103(a), a motion in *limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and definitively rules on the motion." ***Blumer v. Ford Motor Co.,*** 20 A.3d 1222, 1232 (Pa.Super. 2011) (citations omitted), *appeal denied*, ____ Pa. _____, 49 A.3d 441 (2012). Once the trial court enters a definitive ruling on the record, either prior to or during trial, "a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Pa.R.E. 103(b).

Prior to trial, a hearing was held before the trial court at which time Appellant presented argument pertaining to his motion *in limine* "to preclude statements and comments by the DA in opening and closing and in the presentation of evidence that would in any way imply that [Appellant] is guilty because of pre-arrest silence." Defense counsel further explained generally that "[t]he proffered testimony in this case is that the police asked family members of the decedent to have [Appellant] contact them and give them statements."

Specifically, counsel referenced what the victim's "brother" and "sister" "might" say, and anticipated the Commonwealth would argue "that his failure to go to the police is an implication of guilt." N.T., 6/17/15, at 5, 8-9.

Notably, defense counsel later clarified that while the Commonwealth "can present the evidence," it would be improper to argue this failure reflects a consciousness of guilt. N.T., 6/17/15, at 17. Counsel further explained the basis for his objection as follows:

> [Defense Counsel]: I object to any statements by the brother and sister, evidence that they asked him to go to the police, and then any testimony from any police officer as to whether or not he actually went to the police and any argument that the fact that he didn't go to the police is consciousness of guilt because the police were the ones that asked the family to tell him to come to them.

*Id*. at 20.

In response, the Commonwealth represented it would limit its questioning of members of the victim's family to their "voluntary conversations" with Appellant to establish a course of conduct whereby Appellant repeatedly lied to and concealed information from them. *Id*. at 12-17, 21-23. The Commonwealth maintained that such references would be used not to establish Appellant had been hiding from police, but rather to show the credibility of other statements he made in those conversations. The Commonwealth further suggested that if the trial court and defense counsel agreed, the trial court may provide a "cautionary instruction that this evidence on this statement is coming in for the context of [the jury] to determine the credibility of the other statements in that conversation." N.T., 6/17/15, at 20-23. Counsel did not object to the presentation of such testimony for this limited purpose.

Following a brief recess, the trial court reached the following conclusion:

My view is basically that I agree with the Commonwealth in this matter. I do not review it—I do not review it as a pre-arrest silence situation. The conversations that will be testified to by family members with [Appellant] on the day that the victim's body was found and for the period thereafter when they urged him to go to speak to police, that doesn't amount in my mind to pre-arrest silence and so I will deny your motion.

*Id*. at 25. Once again, counsel did not object to the family members' testimony for this specified, limited purpose.

In his brief, Appellant presents the following summary of the trial testimony of three witnesses, Pricilla Jessie, the victim's sister, Aiking Jessie, the victim's brother, and Naneke Green, the victim's cousin:

At trial, Pricilla Jessie, the victim's sister, testified for the prosecution that after the homicide, she asked [] Appellant to go and meet with the assigned detectives and that [ ] Appellant said that he would, "but he never went" (N.T. 6/18/15, 122). Aiking Jessie, the victim's brother, testified for the prosecution that he also asked [ ] Appellant to talk to the police on several occasions after the mother of his sister, and [ ] Appellant said he would do so (N.T. 6/18/15, 165, 166). Mr. Jessie testified that when he subsequently asked [ ] Appellant again if he was going to talk to the police, [] Appellant said that he would not (N.T. 6/18/15, 168). Finally, Neneke Green, the victim's cousin, testified for the prosecution that [ ] Appellant also told her that he was going to talk to the detectives (N.T. 6/23/15, 147).

Brief for Appellant at 10.

Appellant maintains the Commonwealth was "repeatedly permitted over defense objection" to present the aforementioned testimony.

Appellant's Brief at 8, 11. However, as stated previously, defense counsel admitted the Commonwealth could present the evidence, so long as it did not argue it established Appellant's consciousness of guilt, and our review of the certified record reflects that at no time did counsel place a specific objection on the record following the testimony of any of the aforementioned witnesses in this regard.

We conclude that, although he lodged an anticipatory objection prior to the Commonwealth's calling of the victim's brother and sister to testify in connection with his motion *in limine*, counsel failed to make a timely and specific objection to their testimony on constitutional grounds at the time that it was actually proffered. Moreover, counsel did not specifically reference Ms. Green in his argument on June 17, 2015, at all and failed to object following her trial testimony. Accordingly, we find Appellant has waived for appellate review any constitutional challenge to the testimony.[3]

---

[3] Even if Appellant properly had preserved this issue for review during trial, his failure to conclude for "strategic reasons" that he did not wish the trial court to provide an instruction stressing that Appellant had a right to remain silent precludes his attempt to claim on appeal he had been prejudiced. **See Commonwealth v. Norman**, 549 A.2d 981, 986 (Pa.Super. 1988) (*en banc*) ("[w]hen counsel chooses to refuse appropriate curative instructions for legitimate tactical reason, the defense may not plead prejudice on appeal"). In addition, Appellant does not develop an argument in his appellate brief with proper citation to authority as to how the statements of family members impinged upon his constitutional right against self-incrimination. Indeed, our Supreme Court has held otherwise. **See Commonwealth v. Dinicola**, 581 Pa. 550, 563, 866 A.2d 329, 337 (2005) (concluding a mere reference to a defendant's pre-arrest silence does not

*(Footnote Continued Next Page)*

- 7 -

However, Appellant did object prior to the Commonwealth's calling of Detective Edward Toliver to rebut counsel's statement to another officer that "Nobody cared enough to get a search warrant." N.T., 6/24/15, at 8-9. The Commonwealth indicated that while it had not intended to call Detective Toliver to testify regarding the conversation Appellant had had with him on April 7, 2013, it felt the need to question Detective Tolliver in response to Appellant's questioning of "a number of witnesses as to the [D]etective not serving a search warrant on [Appellant's] home and even went so far as to say to Officer Flager, 'nobody cared.'" N.T., 6/24/15, at 4.

As stated previously, our Supreme Court has held that "a mere reference to pre-arrest silence does not constitute reversible error where the prosecution does not exploit the defendant's silence as a tacit admission of guilt." **Commonwealth v. Adams**, 628 Pa. 600, 601, 104 A.3d 511, 513 (2014) (*Opinion Announcing the Judgment of the Court*) citing **Commonwealth v. DiNicola**, **supra**; **Commonwealth v. Whitney**, 708 A.2d 471, 478 (Pa. 1998).[4] In doing so, the plurality in **Adams** stated that

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

necessarily impinge constitutional rights when guilt is not implied and "[e]ven explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt"). **See id** (citation omitted). As such, this claim is also waived for lack of development. **See Commonwealth v. Spotz**, 610 Pa. 17, 157, 18 A.3d 244, 327 (2011).

[4] Of the five justices deciding **Adams**, three agreed that the reference to appellant's pre-arrest silence during the police investigation did not impinge on the defendant's constitutional rights. Among the three was then-Chief

_(Footnote Continued Next Page)_

- 8 -

"[w]hile we have interpreted the constitutional right against self-incrimination generally to prohibit prosecutors from referencing a defendant's silence as substantive evidence of guilt, this Court has also concluded that the right against self-incrimination is not burdened when the reference to silence is 'circumspect' and does not 'create an inference of an admission of guilt.'" *Id.*, 628 Pa. at 609, 104 A.3d at 517 (citation omitted).

Moreover, our Supreme Court held in *DiNicola*, that the prosecution could use a defendant's pre-arrest silence not only to impeach a defendant's testimony but also as a fair response to defense arguments. *Id*. 581 Pa. at 562, 866 A.2d at 336, (finding that "[s]ince the trooper's investigation was obviously limited by [defendant's] decision to reject the request for an interview, we find that the Commonwealth's elicitation of the trooper's testimony regarding this fact constituted fair response"). The admissibility of testimony for purposes of fair response, where there is an appropriate objection thereto, is subject to the trial court's evaluation of probative value versus prejudicial effect under Pa.R.A.P. 403. *DiNicola*, 581 Pa. at 561, 866 A.2d 336.

_(Footnote Continued)_ _____

Justice Ronald Castille, who, in concurrence, offered his view that reference to pre-arrest silence would not violate a defendant's constitutional rights "irrespective of whether the prosecution later exploited the reference." *See Adams*, 628 Pa. at 611, 104 A.3d at 518. (Castille, J., concurring)

In support of its holding that its decision to permit the Commonwealth to present evidence regarding Appellant's failure to report to the Homicide Unit for questioning did not disturb Appellant's Fifth Amendment right against self-incrimination, the trial court stated the following:

> [O]n April 7, 2013, the day the decedent was killed, Detective Tolliver spoke with [Appellant] on the phone and explained to him that he was investigating the homicide and that he would like to talk to [Appellant] as part of gathering information. [Appellant], not a suspect at the time, promised that he would come to Homicide to speak to the detectives further. Almost immediately thereafter, [Appellant] reached out to his counsel, Anthony Petrone, who advised him against speaking to anyone. (N.T. Volume 1, 06/4/2015, p.10).
>
> [Appellant], therefore, insists that he simply followed his counsel's advice, and that his Fifth Amendment rights were violated when his non-reporting to Homicide was brought to light through Detective Tolliver's trial testimony.
>
> This court finds that in the case at bar, Detective Tolliver's testimony offered a reasonable explanation as to why a search warrant was not served on [Appellant] in an attempt to locate the gun from which the shots were fired. As the Commonwealth correctly noted, had a search warrant been served on [Appellant], the latter would have interpreted this circumstance as him [sic] being a suspect, which would have scared him away from talking to the detectives.
>
>> [Detective Tolliver's] testimony came in, clearly, to rebut any allegations of … lazy detective work and the credibility of Detective Tolliver, when he took the witness stand, as the defense attacked Detective Tolliver's credibility. Part of the attack on his credibility was the lack of serving a search warrant and the lack of his diligence. So it came in for that purpose and not to pierce [Appellant's] Fifth Amendment right.
>
> (N.T. Volume, 06/26/2015, pp. 9-10).
>
> Furthermore, it was well known that [Appellant] had a lot of properties, and it wouldn't have been obvious which property to search in the first place. The detectives were also aware that it was easy to dispose of the gun "right away." (N.T. Vollume [sic] 1, 06/24/2015, pp. 7-8).

Upon review of the record, this court is satisfied that the evidence that [Appellant] did not follow through on his promise to come to Homicide to speak to the detectives did not imply any tacit admission of guilt by [Appellant] as it was introduced with a sole purpose of demonstrating the nature and focus of the investigation. Through his trial testimony, Detective Tolliver, whose credibility was a "linchpin" in this case (N.T. Volume 1, 06/24/2015, p. 11), offered a fair response to counter any defense allegations of his supposed lack of conscientiousness as an investigator. The reference to [Appellant's] non-showing up at Homicide was circumspect and contextual; in no way did it create an inference of [Appellant's] consciousness of guilt. This court, therefore, concludes that [Appellant's] right against self-incrimination was not disturbed. No relief is due.

Trial Court Opinion, filed 4/5/16, at 50-52. Upon our review of the record, we find no abuse of the trial court's discretion.

At numerous points throughout trial, Appellant criticized the police for exhibiting apathy in their investigation and highlighted the alleged lack of thoroughness they had showed in their failure to search his various properties for evidence linking him to the murder. **See e.g.** N.T., 6/17/15 at 91-92; 6/18/15, at 82-85; 6/22/15, at 122-23; 6/23/15, at 174-75; 6/29/15, at 31-40, 44-45. It was in response to such criticism that the trial court properly allowed Detective Tolliver's testimony. **See DiNicola**, 581 Pa. at 561-62, 866 A.2d at 335-36 (Commonwealth may introduce evidence of pre-arrest silence when defense's examination of a witness challenges the diligence of police investigation of its case).

In addition, the prosecutor indicated that he had inquired as to whether Appellant wished to have the trial court provide a cautionary instruction to the jury "about how to properly use the evidence of

- 11 -

[Appellant] telling family members and Detective Tolliver that he would talk to the police or go down to the Homicide Division and give a statement, then never did." The prosecutor explained he would not object to such a cautionary instruction, although defense counsel stated that for "stragetic reasons" he did not want the trial court to provide one. N.T., 6/29/15, at 4. As such, Appellant has waived any claim of purported prejudice as a result of Officer Tolliver's testimony regarding Appellant's pre-arrest silence for his failure to request a curative instruction. *See Commonwealth v. Williams*, 532 Pa. 265, 277, 615 A.2d 716, 722 (1992) (finding trial court's instruction to jury not to draw any adverse inference from prosecutor's comment upon defendant's post-arrest silence during closing argument sufficient to cure any potential prejudice therefrom).

Appellant also posits the trial court abused its discretion when it ruled that if he were to present testimony of his former counsel, Anthony Petrone, to establish it was he who advised Appellant not to talk to the police, the Commonwealth would be permitted to question counsel on cross-examination regarding his representation of Appellant in prior criminal homicide investigations. Brief for Appellant at 8-9, 12. Appellant stresses that as a result of this ruling, Attorney Petrone was not called to testify.

A review of the record reveals Appellant mischaracterizes the trial court's decision in this regard, for nowhere did the trial court prohibit Attorney Petrone from testifying; instead, the court indicated it would

provide the prosecution "wide latitude" in its cross-examination of counsel. N.T., 6/26/15, at 13-17. As the trial court pointed out, defense counsel agreed with its observation that any direction Attorney Petrone may have provided to Appellant not to speak with police did not necessarily mean that was, in fact, the reason he did not do so. In addition, the trial court stressed that Attorney Petrone's testimony regarding his advice to Appellant "neither rebuts the fact that [Appellant] lied to the decedent's family nor rebuts the reason Detective Tolliver did not serve a search warrant." Trial Court Opinion, filed 4/5/16, at 54 (footnote omitted).

As the Commonwealth asserts, the scope of cross-examination is always a matter within the trial court's discretion. Commonwealth's Brief at 34 citing **Commonwealth v. Dowling**, 778 A.2d 683, 687 (Pa.Super. 2001). Appellant's arguments pertain only to what prejudice he surmises he "would have suffered" had Attorney Petrone testified. Brief for Appellant at 14. As such, he has failed to show, in fact, that his constitutional rights were violated or that he was prejudiced, as the cross–examination never occurred due to a strategic decision defense counsel made not to call counsel on the stand:

> [Defense Counsel]: And if Petrone does not testify, you're not going to argue in any form or imply or draw reasonable inference that his not going to the police when he told Tolliver he would is consciousness of guilt or a lie or anything else, because that's not why you introduced it?
> [The Prosecutor]: That's correct.
> The Court: Okay. Then we're on the same page?
> [Defense Counsel]: I think we are.

- 13 -

N.T., 6/26/15, at 16-17. In light of the foregoing, Appellant's first issue lacks merit.

In his second question presented, Appellant states the trial court denied his federal and state constitutional rights to due process and a fair trial when it prevented him from presenting testimonial evidence from Jamar Nesmith and Rasheeda Rogers. Appellant maintains their testimony would have established they, along with the victim, had been involved in a prostitution conspiracy to rob drug dealers in the vicinity wherein the victim was murdered. Although not specified in his Statement of Questions Presented, Appellant further argues in his appellate brief that the trial court abused its discretion when it excluded evidence that a BB gun had been found in the decedent's vehicle.

When considering challenges to the admissibility of evidence, we employ a well-settled standard of review:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Witmayer**, 144 A.3d 939, 949 (Pa.Super. 2016) citing

**Commonwealth v. Woodard**, ___ Pa. ____, 129 A.3d 480, 494 (2015).

Initially, we note that while Appellant frames his argument pertaining to this issue in terms of the denial of his constitutional rights in his appellate brief, he did not present a constitutional challenge before the trial court either at the time of trial or in his Rule 1925(b) statement. It is well-established that "[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made." **Commonwealth v. Cousar**, 593 Pa. 204, 231, 928 A.2d 1025, 1041 (2007), *cert. denied,* 553 U.S. 1035, 128 S.Ct. 2429, 171 L.Ed.2d 235 (2008). If counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal. **Commonwealth v. Arroyo**, 555 Pa. 125, 142, 723 A.2d 162, 170 (1999); thus, Appellant has waived this claim for his failure to properly raise it below. **See** N.T., 6/17/15, at 32-36, 39-46; 6/23/15, at 180-81; Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); **Dowling**, **supra** at 686 (finding appellant waived claim on appeal where he presented one theory in his Rule 1925(b) statement and a different one in his appellate brief).

In addition, to the extent Appellant generally asserts the trial court abused its discretion in excluding the testimony of Mr. Nesmith and Ms. Rogers in his Rule 1925(b) statement and appellate brief, we find he waived this challenge for his failure to raise a timely and specific objection with the trial court.

Prior to trial, the parties presented argument on the Commonwealth's motion to exclude the proposed testimony of Mr. Nesmith who had given a statement to a defense investigator the prior week. Positing the statement lacked proper foundation and was rife with hearsay, the Commonwealth explained that if called to testify, Mr. Nesmith would state that he had committed robberies with the victim in the past and that he received a call from someone indicating there was "a hit" on her. The Commonwealth elaborated that such evidence would be used to show there was another reason why the victim would have been in the block of Bailey Street where the murder occurred and that someone other than Appellant would have had a motive to kill her. N.T., 6/17/15, at 30-31. The Commonwealth highlighted that because there was no other evidence to corroborate Mr. Nesmith's statements that the victim had engaged in prior robberies, such testimony would be improper under Pa.R.E. 404(b).[5]

_____

[5] This rule reads, in relevant part, as follows:

> **(b) Crimes, Wrongs or Other Acts**.
> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> *(2) Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(Footnote Continued Next Page)*

- 16 -

In response, Appellant averred such testimony went to the heart of his defense in that Mr. Nesmith and Ms. Rogers knew the victim well and the trio had engaged in dangerous activities as was proven by the victim's robbery conviction. N.T., 6/17/15, at 32-35. Appellant further related that Mr. Nesmith had been shot at, proving he was the victim of a hit. *Id*. at 34. Appellant admitted no one ever had been arrested for shooting of Mr. Nesmith. *Id*. at 34-35. Following a brief recess, the trial court made the following ruling:

> THE COURT: I know the defense has explained to me that defense reviews this as vitally important to the defense in this case, and that may be, but the evidence lacks the proper foundation. It's speculative. And ultimately all it proves, even if it's true, is that it goes to character assassination of the deceased. I'm going to grant Commonwealth's motion to preclude it.

*Id*. at 35.

Appellant did not object to the trial court's decision at this juncture, and the trial court proceeded to consider on the record a juror issue. Thereafter, defense counsel indicated his investigator had just handed him a Facebook page belonging to Ms. Rogers. Although he admitted that prior thereto Ms. Rogers had denied any involvement in the murder, counsel maintained that the innuendo contained in the Facebook post constituted a

*(Footnote Continued)* ─────────────

Pa.R.E. 404(b)(1), (2).

clear and direct implication that Mr. Nesmith is "a rat." *Id*. at 39-41. Counsel added that as he was pondering the trial court's ruling, he remembered surveillance video of the area depicted another individual, clearly not Appellant, wearing a gray hoodie and walking down Bailey Street and returning about twenty-five minutes later not wearing the hoodie. *Id*. at 41-43. Counsel posited it would be fair to present this evidence, to the jury to establish another individual may have had a motive to commit the murder. *Id*. at 42.

The Commonwealth retorted, *inter alia*, that the Facebook post was not authenticated and its contents were vague. *Id*. at 44-45. The trial court indicated that the document did not change its ruling, and Appellant, again, did not place a timely and specific objection on the record. *Id*. at 46. As a result, for the reasons set forth *supra*, Appellant has waived this issue for appellate review.[6]

_____

[6] Notwithstanding, even if Appellant had preserved his claim that Mr. Nesmith and Ms. Rogers should have been permitted to testify, we would conclude that it lacks merit because the trial court properly exercised its discretion in granting the Commonwealth's motion to exclude this proposed testimony. Appellant claims that the testimony would have tended to show the crimes of which Appellant was accused may have been committed by someone else and that it was "crucial to the defense to be able to present a basis for the jury to find that she may have been there for another purpose and that she may have suffered harm as a result of her involvement in previous criminal activity." Brief for Appellant at 24-25. To the contrary, the mere suggestion that someone else may have had a motive to commit a crime does not constitute evidence. *Commonwealth v. Foley*, 38 A.3d 882, 887 (Pa.Super. 2012). Also, a review of the record reveals Appellant
*(Footnote Continued Next Page)*

Finally, Appellant challenges the trial court's ruling in response to the Commonwealth's motion *in limine* presented during trial asking the court to preclude Appellant from introducing evidence that police had recovered a BB gun from the victim's car after her body was found. N.T., 6/23/15, at 177. In doing so, Appellant maintains the fact that a BB gun was found in the victim's vehicle corroborates the proposed testimony of Mr. Nesmith which would have suggested individuals in the vicinity other than Appellant could have had contact with or a motive to harm the victim. While the trial court indicated it would have permitted the admission of this evidence if Appellant had asserted he acted in self-defense, it ultimately found it "less than insignificant" and, therefore, inadmissible. N.T., 6/23/15, at 178-179. We find the trial court did not abuse its discretion in excluding this proffered

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

presented no extrinsic evidence at trial to corroborate the bald allegations that the victim had been involved in prior robberies. As such, the trial court properly determined the evidence lacked a proper foundation, was speculative and, if it were admitted, "would undeniably go to character assassination of the deceased." Trial Court Opinion, filed 5/5/16, at 57.

The trial court also correctly determined that Ms. Rogers' Facebook post and the referenced videotape were inadmissible evidence. Hearsay is an out-of-court statement offered for the truth of the matter asserted. Pa.R.E. 801(c). Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence. **Commonwealth v. Savage**, 2017 WL 900023, at *4 (Pa.Super. Mar. 7, 2017). In this case, Appellant fails to argue or to point to any exception to the hearsay rule under which either Ms. Rogers' Facebook post or the referenced videotape might fall.

evidence. **Witmayer**, **supra**. Appellant's second claim has no arguable merit.

Judgment of Sentence Affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/21/2017

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF
PENNSYLVANIA

vs.

RUDOLPH MCGRIFF

**FILED**

APR – 5 2016

Criminal Appeals Unit
First Judicial District of PA

: CP- 51-CR-0002445-2014
:
:
:
:
:
: SUPERIOR COURT
: NO. 9 EDA 2016
:

OPINION

GEROFF, J. APRIL 5, 2016

On July 1, 2015, after a jury trial, the Defendant, Rudolph ("Ru"; "Rudy") McGriff, was convicted of murder of the first degree, carrying a firearm without a license, carrying a firearm on the public streets, and possessing an instrument of crime. Also on July 1, 2015, this court sentenced the Defendant to a mandatory term of life imprisonment without parole on the murder-of-the-first-degree charge. The Defendant also received concurrent sentences of two and one-half (2 ½) to five (5) years on the charge of carrying a firearm without a license, two and one-half (2 ½) to five (5) years on the charge of carrying a firearm on public streets, and two and one-half (2 ½) to five (5) years on the charge of possessing an instrument of crime. (N.T. 07/01/2015, pp. 8-9; 16-17).

At trial, Petitioner was represented by Richard DeSipio, Esquire. Burton A. Rose, Esquire, was subsequently retained to represent the Defendant on appeal.

On December 23, 2015, the Defendant filed a Notice of Appeal. On January 12, 2016, this court ordered counsel for the Defendant to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. § 1925(b). On or about February 10, 2016, counsel for the Defendant filed a § 1925(b) Statement.

In his Statement, the Defendant raises the following issues, *verbatim*:

1. The trial court abused its discretion in permitting the prosecutor to present evidence that the Defendant had repeatedly declined to report to the Philadelphia Police Homicide Unit for questioning and ruled that the defense would not be permitted to present the testimony of attorney Anthony Petrone, Esquire who would have testified that he instructed the Defendant, who was his client, not to talk to the Homicide Unit detective which would have been crucial in countering the prosecutor's argument that the Petitioner had refused to do so as proof of the Defendant's consciousness of guilt; in this regard, the trial court abused its discretion in ruling that, if called to the stand, Mr. Petrone could be questioned about the Defendant's previous criminal cases, thus resulting in Mr. Petrone's not being called to testify.

2. The trial court abused its discretion in refusing to permit the defense to call witnesses such as Jamar Nesmith, who resided at 3225 N. Bailey Street, and Rasheed[a][1] Rogers to testify that the slaying of victim may have been a response to her participation in a scheme with Nesmith and Rogers to commit armed robberies on Bailey Street of drug dealers, along with evidence that a BB gun was found in the victim's vehicle, to counter the Commonwealth's argument that the victim was slain by the Defendant

Defendant's Statement of Errors To Be Complained of on Appeal, 02/10/2016, pp. 1-2.

## THE EVIDENCE

The evidence adduced at trial established beyond reasonable doubt that in the early morning hours of April 7, 2013, the Defendant shot and killed Malisha Jessie (nicknamed Lai Lai). The jury also found the evidence to be sufficient to support the guilty verdict on the

---

[1] Appellate counsel incorrectly identifies Rasheeda Rogers as Rasheed Rogers.

2

charges of carrying a firearm without a license, carrying a firearm on the public streets, and possessing an instrument of crime.

## *The Murder and Investigation*

Erica Burton, a friend of the decedent, testified that on April 6, 2013, she and the decedent met at about 5:00 pm and visited three different bars together. Burton stated that she and the decedent did not have "a lot" to drink that night. (N.T. Volume 1, 06/17/2015, pp. 94-97, 99).

Burton stated that at some point that evening, she received a phone call from her mother who was in the same area; they met at Germantown Avenue and Bristol Street where the decedent's car was also parked at about 2:05 am. Burton got in the car with her mother and they drove home; the decedent drove behind them. (N.T. Volume 1, 06/17/2015, p. 99). Burton expected the decedent to follow her toward Route 76; however, despite mentioning to Burton that she was going home, the decedent did not follow her to the expressway. (N.T. Volume 1, 06/17/2015, pp. 100-101). Burton noticed that it was about 2:13 or 2:15 am. (N.T. Volume 1, 06/17/2015, p. 101). "[W]hen her car turned off, I looked in my rearview and said, "Where's Lai going," and I looked at the clock." (N.T. Volume 1, 06/17/2015, p. 101).

That morning, April 7, 2013, Burton received a phone call from the decedent's son, Myzeh, who was looking for his mother. Soon thereafter, Burton was also contacted by the decedent's grandmother who informed her that she had received a visit from police with regard to "a girl with tattoos [who] had been shot in the head." (N.T. Volume 1, 06/17/2015, pp. 104-05).

3

Immediately thereafter, Burton went to the decedent's house where she came in contact with detectives. The detectives drove her to Homicide where she gave a statement. Burton recognized the statement she gave to Detectives Edward Tolliver and Micah Spotwood on April 7, 2013 at 3:30 pm and confirmed that while at Homicide, she also identified a photograph of the decedent which the detectives showed her. (N.T. Volume 1, 06/17/2015, pp. 105-08).

Lonnie Wilson testified that on Saturday, April 6, 2013, into Sunday morning, April 7, 2013, he was inside his home on the 3200 block of North Bailey Street in Philadelphia when he was awakened by the sound of two gunshots at about 2:30 am.[2] He did not call the police after hearing those two gunshots; to his knowledge, no one did. He indicated that he did see the police on the block at 8:30 or 9:00 am when he came out to walk his dog. (N.T. Volume 1, 06/17/2015, p. 114).

Wilson stated that he talked to a detective on location and that he also later gave a statement to Detective Brian Peters. He recognized the statement bearing his signature. (N.T. Volume 1, 06/17/2015, p. 115).

Under cross-examination, Wilson explained that at about 2:30 am, he heard a female very loudly say, "No." (N.T. Volume 1, 06/17/2015, p. 116). Wilson estimated that the sound came from about six houses away. He explained that he did not call police because "sometimes it's a common occurrence in the neighborhood if you hear gunshots. Nobody goes to the window. Nobody goes to the door. You just don't call the cops. Usually a patrol car will come by after hearing shots. But this particular night ... I didn't see any beacons." (N.T. Volume 1, 06/17/2015, p. 117).

---

[2] Wilson was confident about the time he heard the gunshots because he had a digital clock right by his bed. (N.T. Volume 1, 06/17/2015, p. 114).

4

Crime Scene Investigator Ronald Sirianni testified that on April 7, 2013, he was called upon to process a crime scene on the 3200 block of North Bailey Street with Police Officer Terry Tull. (N.T. Volume 1, 06/17/2015, pp. 123, 125). Investigator Sirianni explained that he generated a report documenting his findings and that he collected certain items of physical evidence from the scene and placed them on Philadelphia Police Department property receipts; he also photographed the crime scene. (N.T. Volume 1, 06/17/2015, p. 123).

Investigator Sirianni indicated that he and Officer Tull arrived at the scene at 8:37 am and remained on the scene until 10:35 am. By the time they arrived at the scene, it had already been secured by the police and the crime scene tape was in place. (N.T. Volume 1, 06/17/2015, p. 125).

For the benefit of the jury, Investigator Sirianni reviewed the photographs taken on location noting that they fairly and accurately depicted the area as it appeared upon his arrival on location. (N.T. Volume 1, 06/17/2015, pp. 126-50).

Investigator Sirianni explained that the ballistics evidence collected from the scene and marked by numbered placards contained three fired cartridge casings (FCCs), and two projectiles. (N.T. Volume 1, 06/17/2015, pp. 126-27, 133-34). The ballistics evidence was packaged, numbered to correspond with the numbers on the placards, put on property receipts, and then sent to the Ballistics Unit for further identification. (N.T. Volume 1, 06/17/2015, pp. 133-34). Three FCCs and two projectiles were put on Property Receipt No. 9015154. (N.T. Volume 1, 06/17/2015, pp. 134-35).

Investigator Sirianni indicated that there was a lot of blood around the deceased. (N.T. Volume 1, 06/17/2015, pp. 126-27). Property Receipt No. 9015155 contained a sample of the decedent's blood. (N.T. Volume 1, 06/17/2015, pp. 135-36).

5

Myzeh Jessie-Ross, thirteen at the time of the trial and eleven at the time of the decedent's death, stated that the decedent was his mother. (N.T. Volume 2, 06/18/2015, p. 12). He acknowledged the Defendant's presence in the courtroom and stated that he was his mother's boyfriend, "Ru." (N.T. Volume 2, 06/18/2015, p. 13). Myzeh noted that he lived with his mother from age seven to age nine, that he subsequently lived with his grandmother, and that starting in December 2012, when the decedent received visitation rights, he would spend weekends with her. (N.T. Volume 2, 06/18/2015, pp. 13-14).

Myzeh indicated that he was six years old when he first met the Defendant. He noted that the Defendant was the decedent's boyfriend, though it was an on- and off-relationship, which continued up until the time of the decedent's death. Myzeh stated that he had been to the Defendant's home often when he lived with his mother and that that sometimes he would spend the night at his place. Myzeh also noted that he even helped the Defendant move to his duplex in West Philadelphia. (N.T. Volume 2, 06/18/2015, pp. 15-17).

Myzeh explained that he knew that the Defendant had two phones and that he saw the Defendant with his two phones when he went to the movies with him. (N.T. Volume 2, 06/18/2015, p. 18). He also acknowledged dialing the Defendant's telephone number at the decedent's request multiple times when she was driving and said that he knew the Defendant's telephone number by heart. (N.T. Volume 2, 06/18/2015, pp. 19-20).

Myzeh confirmed that the weekend she died, the decedent had visitation of him and that he was going to be staying with her. On Friday, April 5th the decedent picked him up from school and he stayed at her home (where his grandmother Mary also lived). (N.T. Volume 2, 06/18/2015, p. 21-22).

6

Myzeh was awakened that night by his mother's screaming; she was on the phone with the Defendant (whom she called by name). (N.T. Volume 2, 06/18/2015, pp. 23-24). Myzeh stated that he overheard the decedent tell the Defendant that she "should have busted the windows out of his car and flattened his [car] tires when she saw ...their car out there the other day." (N.T. Volume 2, 06/18/2015, p. 24). Myzeh also added, "She said he's mad that ... she got his name covered up with a [tattoo of a] diamond on her finger and how he moved a girl into a house." (N.T. Volume 2, 06/18/2015, pp. 25-26).

Myzeh also stated that on April 6, 2013, he and the decedent attended a family gathering at her cousin's place. (N.T. Volume 2, 06/18/2015, p. 28). He noted that on the way to the cousin's place they went to Bailey Street and that he remembered that block because that was where the decedent "got killed on." (N.T. Volume 2, 06/18/2015, p. 30). Myzeh stated that the decedent parked her car at the corner across the street from a store. She then took her phone and walked to the middle of the block and proceeded between the parked cars on the right side of the street; Myzeh, who remained in the car, lost sight of her for a few minutes. (N.T. Volume 2, 06/18/2015, pp. 30-31). When the decedent came back to the car, she was on the phone. Myzeh knew that the decedent was talking to the Defendant because she asked, "Ru, where are you at?" (N.T. Volume 2, 06/18/2015, p. 33).

After she got into the car, they proceeded up the block; Myzeh saw the Defendant's silver sports car, with which he was familiar, parked on the left side of the block. (N.T. Volume 2, 06/18/2015, p. 33).

The decedent then proceeded driving "to a local school." (N.T. Volume 2, 06/18/2015, p. 34). They then saw the Defendant walking the dog and they got out of the car and approached him; the Defendant was wearing a gray hoodie. The Defendant was not paying

7

attention to them until the time the decedent started screaming something to the effect of busting out the windows of his car and slashing the tires. Following the encounter, they returned to the car and went to the cousin's cookout. (N.T. Volume 2, 06/18/2015, p. 34, 36, 44).

After the cookout, they drove back to the decedent's home. That night, the decedent's friend Erica came over; the decedent and Erica put makeup on, got dressed, and left. That was the last time Myzeh saw his mother. (N.T. Volume 2, 06/18/2015, pp. 36-37).

On Sunday morning, when Myzeh woke up, he went into the decedent's room looking for her, but she was not there. He asked his grandmother Mary where she was, and grandmother did not have an answer. (N.T. Volume 2, 06/18/2015, pp. 37-38).

Myzeh remembered meeting with a few sets of detectives in this case. The detecitves asked him whether he knew the decedent, showed him her ID and her phone, and asked him for the phone's passcode so that they could unlock the phone. The detectives also showed Myzeh a picture of Bailey Street, and Myzeh recognized the block where he had gone on Saturday afternoon with the decedent. He shared with the detectives what had happened on the block that Saturday afternoon and told them about the decedent's boyfriend, the Defendant. (N.T. Volume 2, 06/18/2015, pp. 38-40). Myzeh also provided the detectives with Erica's phone number and the immediate family's phone number. (N.T. Volume 2, 06/18/2015, p. 41).

Myzeh stated that two other detectives came to the house at a later time; he remembered meeting Detective Edward Tolliver. It was at that point that he learned that his mother was dead. (N.T. Volume 2, 06/18/2015, p. 41). Detective Tolliver and his partner, Micah Spotwood, later came to take a formal written statement from him. (N.T. Volume 2, 06/18/2015, p. 43).

Freddie Brown testified that on the morning of April 7, 2013, he was inside his home at 3223 North Bailey Street, sleeping in front of a television downstairs when he was awakened by

8

some "noises in the street." (N.T. Volume 2, 06/18/2015, pp. 63-64). It sounded like two people – a male and a female - were arguing. Brown looked out the window, then went back to his seat; then he heard about two shots. (N.T. Volume 2, 06/18/2015, pp. 64-65).

Brown stated that he looked outside again and noticed someone standing in the middle of the street. (N.T. Volume 2, 06/18/2015, p. 66). Brown stated that while he could not describe the person he remembered that he was wearing "something gray, like a hoodie, a gray hoodie." (N.T. Volume 2, 06/18/2015, p. 68). He also remembered that the person was taller than him - about five foot six, and that he was not a "large guy" though heavier than Brown. (N.T. Volume 2, 06/18/2015, p. 68). When asked about the race of the person, he responded, "I would say he's black." (N.T. Volume 2, 06/18/2015, p. 69). Brown was not sure about the person's age. (N.T. Volume 2, 06/18/2015, p. 69). Brown remembered that the incident happened after 2:30 am. "The whole ordeal that I heard started between 2:00 and 2:30 [am]." (N.T. Volume 2, 06/18/2015, p. 72).

Brown indicated that he did not call 911 that night. When the sun rose in the morning, he did not remember police officers being on the block but he did remember seeing the decedent's body lying on the street between two cars. Before he noticed her body, he heard "a fire truck with the low sound," which to him signified the presence of "a body or something." (N.T. Volume 2, 06/18/2015, p. 72). He remembered seeing the deceased on the block once or twice before, including on Saturday when he noticed her walking down the street. (N.T. Volume 2, 06/18/2015, p. 74).

Brown remembered getting in a police car on the morning of April 7, 2013 and going to Homicide, where he was interviewed by Detectives Tolliver and Spotwood. He confirmed that

9

the detectives asked him questions and that he provided answers and signed the bottom of each page of the statement. (N.T. Volume 2, 06/18/2015, pp. 73, 77).

Brown also noted that he was on medications that night and that he was prescribed many different medication for various ailments. He also confirmed that he was taking medication for his kidney problems and that he received kidney dialysis. Brown conceded that that night, he heard more than two voices (none of which he recognized). (N.T. Volume 2, 06/18/2015, pp. 85-87).

Brown confirmed that the police showed him some photographs, but noted that he could not recognize anyone on those photographs. (N.T. Volume 2, 06/18/2015, p. 88). He also confirmed that gunshots were quite common in that neighborhood. (N.T. Volume 2, 06/18/2015, pp. 88, 90).

Under redirect examination, Brown acknowledge stating the following to the detectives:

I was inside my house downstairs in a chair in the front room. I woke up [at] about 2:30 am. I was going to take my medication and I heard a woman screaming. I couldn't make out what she was saying. I only heard the one voice. I heard gunshots.

(N.T. Volume 2, 06/18/2015, p. 92).

He also confirmed that he remembered providing the following information at the preliminary hearing:

QUESTION: What did you hear?

ANSWER: I heard some noise sounded like an argument or something. People arguing and talking loud.

QUESTION: How many voices did you hear argue and talking loud?

ANSWER: Actually, I heard one voice.

10

QUESTION: Was that voice a male or a female?

ANSWER: It was a female.

QUESTION: When you say the female voice was arguing and talking loud, were you able to hear what the female voice was actually saying?

ANSWER: No, I wasn't. But I know it was high volume.

(N.T. Volume 2, 06/18/2015, p. 94).

Brown confirmed that defense investigator, Ron Felder, came to his home and took photographs. (N.T. Volume 2, 06/18/2015, p. 95).

On re-cross examination, Brown stated that there were, in fact, more than two voices out on the street that night. (N.T. Volume 2, 06/18/2015, p. 98).

On redirect examination, he stated that defense investigator Felder visited him in his home the night before he testified. (N.T. Volume 2, 06/18/2015, p. 98). He insisted that no one influenced what he said. "I can only say what I see or hear." (N.T. Volume 2, 06/18/2015, p. 99). He reconfirmed that he heard more than two voices that night. (N.T. Volume 2, 06/18/2015, p. 99).

Priscilla Jessie testified that she was the younger sister of the decedent. (N.T. Volume 2, 06/18/2015, p. 106). She confirmed that she knew the Defendant for about five years as the decedent's boyfriend and that the Defendant and the decedent were in an "on and off," "toxic" relationship. (N.T. Volume 2, 06/18/2015, p. 107).

Ms. Jessie stated that on April 4, 2015, she spoke on the phone with the decedent. She noted that the decedent sounded a little sad. The decedent explained to Ms. Jessie that she did not want to be with the Defendant anymore and that "she was done." (N.T. Volume 2, 06/18/2015, p. 109). The decedent also mentioned that she had an envelope containing the

11

Defendant's address but addressed to a girl; the decedent believed that some girl was staying at the house with the Defendant. (N.T. Volume 2, 06/18/2015, p. 110).

Ms. Jessie indicated that next she spoke to the decedent on the phone on the morning of April 6, which was the last time she ever talked to her. (N.T. Volume 2, 06/18/2015, pp. 110-11).

Ms. Jessie noted that on Sunday, April 7, 2013, she received a phone call from her mother who informed her that the decedent was dead. Jessie explained that she also called the Defendant because the decedent and the Defendnat were normally together on weekends and she expected them to be together; the Defendant did not answer the phone. (N.T. Volume 2, 06/18/2015, p. 111).

When Ms. Jessie called the decedent's phone, Detective Tolliver picked up. He told her that "he had a car and he had a woman, she was unidentified." (N.T. Volume 2, 06/18/2015, p. 112). Jessie then went to the decedent's house on Mount Vernon Street. (N.T. Volume 2, 06/18/2015, p. 113).

Ms. Jessie also stated that the Defendant came to the decedent's Mount Vernon home wearing a gray True Religion hooded sweatshirt and camouflage pants. (N.T. Volume 2, 06/18/2015, p. 114). When she asked him where he had been and noted that she tried calling him multiple times, he told her that "he just woke up." (N.T. Volume 2, 06/18/2015, p. 120). He also told her that he went to a nightclub and a fashion show the night before and that he saw the decedent for the last time on Thursday. (N.T. Volume 2, 06/18/2015, p. 120). Because Ms. Jessie remembered that Myzeh told her that he and the decedent had seen the Defendant on Saturday, she concluded that the Defendant was lying to her. (N.T. Volume 2, 06/18/2015, p. 121).

When someone brought up Bailey Street where the decedent was killed, the Defendant said, "Oh, oh, Bailey Street? I got a house on Bailey Street." (N.T. Volume 2, 06/18/2015, p. 121). Ms. Jessie noted that the Defendant looked "shocked and confused." (N.T. Volume 2, 06/18/2015, p. 121).

Ms. Jessie also stated that she and the Defendant had a conversation outside the decedent's home that day and that he asked her who had the decedent's cell phone. When she told him that "the cops had her phone," he replied, "[O]h, you can get the phone back. We can do this on our own." (N.T. Volume 2, 06/18/2015, p. 122). She interpreted his words as meaning that he would try to figure out who committed the crime. Ms. Jessie also asked the Defendant if he would go to the police station, and he said he would go but never did. (N.T. Volume 2, 06/18/2015, p. 122).

Ms. Jessie also stated that in the week following her sister's murder, the Defendant called her several times but that she did not take all of his phone calls because she was scared. When they did talk, he kept asking her about the phone; he wanted Ms. Jessie to get the phone back from the police. (N.T. Volume 2, 06/18/2015, p. 123).

Ms. Jessie also noted that the week of the murder, she had gone to the Defendant's Instagram page and that she took a snapshot of a photograph which the Defendant posted on Saturday, April 6th. She explained that the reason she saw the picture was that she was checking to see what the decedent was doing over the weekend. (N.T. Volume 2, 06/18/2015, pp. 124-25). Ms. Jessie took a screen shot of the Defendant's Instagram post from April 6, 2013 on May 21, 2013; she provided the screen shot to the District Attorney. (N.T. Volume 2, 06/18/2015, p. 125). Ms. Jessie indicated that the Instagram shot was deleted soon thereafter, that the user name of the Instagram post was 'Achilles Da Boss,' and that that account belonged to the

13

Defendant with whom she had been friends on Instagram. (N.T. Volume 2, 06/18/2015, pp. 125, 127).

Ms. Jessie acknowledged her awareness of prior physical incidents between the decedent and the Defendant while they were in a relationship. (N.T. Volume 2, 06/18/2015, p. 128). One incident occurred over their weekend trip to Atlantic City. The decedent and the Defendant returned on Sunday; when Ms. Jessie went to see the decedent at her house on Mount Vernon Street, she noticed that the decedent had a "busted eye and a busted lip." "Her eye was black and ... swollen. And at the time, she had braces, so the braces were cut into her bottom lip." (N.T. Volume 2, 06/18/2015, p. 130). When asked what had happened, the decedent told Ms. Jessie that she and the Defendant had been fighting; when Ms. Jessie tried probing this circumstance further, the decedent got angry with her and said that she did not want to talk about it. (N.T. Volume 2, 06/18/2015, p. 130).

The second incident occurred in the summer of 2012. Ms. Jessie stated that the decedent kept calling her phone but that she missed her calls. When they finally connected, the decedent asked Jessie to "come get [her.]" (N.T. Volume 2, 06/18/2015, pp. 130-31). Ms. Jessie then drove to the Defendant's place at Delancey Street to pick up the decedent. "[S]he got into the car and she had on sunglasses and I asked her to remove the sunglasses. And she had a busted eye and another busted lip and was complaining about abdominal pains." (N.T. Volume 2, 06/18/2015, p. 131).[3]

Ms. Jessie confirmed that she gave a statement to Detective Tolliver on April 9, 2013 and that she reviewed and signed the statement. (N.T. Volume 2, 06/18/2015, p. 133).

---

[3] Ms. Jessie also stated that the decedent's eye was swollen and that her lip was black, "like, cut inside." (N.T. Volume 2, 06/18/2015, p. 131).

14

Under cross-examination, Ms. Jessie conceded that she never saw the Defendant strike the decedent. (N.T. Volume 2, 06/18/2015, p. 139). She also confirmed that when the Defendant heard that the decedent was killed on Bailey Street, he looked shocked and confused and immediately responded, "I have a house on Bailey Street." (N.T. Volume 2, 06/18/2015, p. 147).

Aiking Jessie, the decedent's brother, testified that on April 7, 2013, he learned about the decedent's killing from his family. Upon receiving the tragic news, he called the Defendant whom he had known to be the decedent's boyfriend; however, the Defendant did not answer the phone. Mr. Jessie acknowledged the Defendant's presence in the courtroom. (N.T. Volume 2, 06/18/2015, pp. 159-60).

Mr. Jessie stated that he left a voicemail for the Defendant. He then drove to the decedent's house where the Defendant later arrived as well. (N.T. Volume 2, 06/18/2015, p. 161).

> ...I told him that my sister was dead. And at that point in time when I told him, ... he acted like he didn't know what I was talking about. And I said, ... "Well, I don't understand how you don't know what I'm talking about because it pretty much happened on your block, which is Bailey Street." And when I mentioned Bailey Street, he was like, "Bailey Street?" ....
> "Like, how did you know I had a house on Bailey Street?"
>
> ....
> I said it was pretty much the talk of the house.

(N.T. Volume 2, 06/18/2015, p. 163).

Mr. Jessie stated that he returned to the decedent's home on April 8, 2013, and that the Defendant also showed up there with two girls whom Mr. Jessie had never met before. (N.T. Volume 2, 06/18/2015, p. 164). Mr. Jessie asked him if he "[got] a chance to talk to the police officers." (N.T. Volume 2, 06/18/2015, p. 165). The Defendant told Mr. Jessie that he would go

15

to the police. Mr. Jessie stated that he talked to him about going down to the police several times. (N.T. Volume 2, 06/18/2015, pp. 165-66).

Mr. Jessie indicated that over the course of the next three weeks he had one interaction with the Defendant when the Defendant called him on the phone. When the Defendant called him, Mr. Jessie talked to him again about going down to the police, and the Defendant said he would do that. (N.T. Volume 2, 06/18/2015, p. 166).

Mr. Jessie also stated that they ended up meeting in person at the end of April 2013 and that they talked for about 15-20 minutes. (N.T. Volume 2, 06/18/2015, p. 168). Mr. Jessie noted, "You know, I asked him again about, you know, did he go down to the police, give a statement. And again he told me no." (N.T. Volume 2, 06/18/2015, p. 168). Mr. Jessie also mentioned that during their meeting, the Defendant, yet again, asked him about the decedent's telephone. "He just asked me, ... well, ..., where is her phone,... who has the phone? And I let him know that the police has her phone." (N.T. Volume 2, 06/18/2015, p. 169).

When asked whether the Defendant probed him about the investigation, Mr. Jessie said, "Sort of, kind of, was asking, ... almost hinting,... do the police have any witnesses or ... are they looking at anybody. So it was almost, sort of ... seemed like he was fishing." (N.T. Volume 2, 06/18/2015, p. 169).

Mr. Jessie was shown the statement he gave to the detectives on April 9, 2013 and attested to its authenticity. (N.T. Volume 2, 06/18/2015, p. 170-72).

Under cross-examination, Mr. Jessie confirmed that on April 8, 2013, when the Defendant showed up at the decedent's home, Mr. Jessie looked him in the eye and asked him directly if he had killed his sister; the Defendant responded that he would never do that to his sister. (N.T. Volume 2, 06/18/2015, pp. 181-82). Under redirect examination, Mr. Jessie noted

16

that it appeared that the Defendant was "acting" when he said that. (N.T. Volume 2, 06/18/2015, p. 182). Under re-cross examination, Mr. Jessie confirmed that he did not believe the Defendant. (N.T. Volume 2, 06/18/2015, p. 185).

Femi-Ama ("Femi") Johnson testified that the Defendant was her boyfriend for about three and a half years. She noted that they never talked about their relationship as being monogamous. (N.T. Volume 3, 06/19/2015, p. 9). She indicated that when she began dating the Defendant, he did not tell her that he was married; she added, however, that she did not ask him about his marital status. (N.T. Volume 3, 06/19/2015, pp. 6-7, 9).

Johnson indicated that she did not know the decedent personally; however, she knew of her through going through the Defendant's Instagram account and "clicking on people who liked his picture or people that were tagged." (N.T. Volume 3, 06/19/2015, pp. 10-11). When she asked the Defendant about her, he informed her that he and the decedent had been in a previous relationship. According to Johnson, she assumed they were no longer in a relationship; however, she did not ask the Defendant about it directly. (N.T. Volume 3, 06/19/2015, p. 11).

Johnson stated that she moved into the Defendant's 3229 North Bailey Street home around early 2013; she lived there rent-free and was covering only the utilities. (N.T. Volume 3, 06/19/2015, pp. 13-14). She noted that the Defendant spent the majority of his time in South Carolina where he relocated around 2012. (N.T. Volume 3, 06/19/2015, p. 16).

Johnson indicated that on Sunday, April 7, 2013, she learned from the Defendant that the decedent was killed when she and the Defendant were at his friend Theme's house in West Philadelphia. (N.T. Volume 3, 06/19/2015, pp. 19, 21).

Johnson stated that on Saturday, April 6, 2013, she was at home on Bailey Street, and that the Defendant was in and out that afternoon. She noted that he went out with a friend though she

17

did not ask him exactly where he was going. (N.T. Volume 3, 06/19/2015, pp. 25- 26). Then he returned for a "quick second," only to go out again. (N.T. Volume 3, 06/19/2015, p. 26).[4]

Shortly thereafter, Johnson received a phone call from the Defendant. The Defendant explained to her that he had forgotten his cell phones at Bailey Street and asked her to bring them over to his friend Theme's house where he was at that moment. (N.T. Volume 3, 06/19/2015, pp. 27-28). Although Johnson was already in bed, she "assumed there had been alcohol involved" as the Defendant "didn't necessarily sound completely sober." (N.T. Volume 3, 06/19/2015, p. 29). According to Johnson, she delivered the Defendant's two phones to him to prevent an accident. (N.T. Volume 3, 06/19/2015, p. 29).

When she returned, she did not see any police on location. She spoke to one of her neighbors, an elderly man, who informed her that someone had been killed on the block. (N.T. Volume 3, 06/19/2015, pp. 34-35).

Johnson stated that on May 29, 2013, Detectives Tolliver and Spotwood came to meet her in her classroom at the school where she was teaching. (N.T. Volume 3, 06/19/2015, p. 37). She followed them to Homicide where she ended up spending several hours. (N.T. Volume 3, 06/19/2015, p. 39).

In the interview room, the detectives asked her "a variety of things" relating to both the decedent and the Defendant and showed her a photograph of a piece of mail with her name and address on it (they explained that they retrieved that photograph from the decedent's phone). (N.T. Volume 3, 06/19/2015, pp. 43-44). Johnson confirmed that the detectives took a question and answer interview statement from her that day and typed it up, and that she signed and dated every page of the statement as well as her Statement of Adoption Attestation. (N.T. Volume 3,

---

[4] Johnson clarified that the "quick second" the Defendant was back at the house before leaving yet again lasted about ten minutes and that they had a brief conversation. (N.T. Volume 3, 06/19/2015, p. 27-28).

18

06/19/2015, p. 45-46, 50-51). She also confirmed that she identified photographs of the Defendant, Charles Bonner (Theme), and the decedent. (N.T. Volume 3, 06/19/2015, pp. 50-51). Johnson noted, however, that she only skimmed, and not fully reviewed the statement before signing it as she was tired and "wanted to get out of there." (N.T. Volume 3, 06/19/2015, p. 46).

She confirmed that following her encounter with the detectives, she hired a criminal defense attorney, Ray Driscoll, to represent her in this case, and that it was the Defendant who referred her to Driscoll. (N.T.Volume 3, 06/19/2015, p. 56).

Johnson noted that she told the Defendant that she was picked up by homicide detectives at her school and that she made a statement at Homicide. (N.T. Volume 3, 06/19/2015, p. 78).

Johnson confirmed that the Defendant told her that there was an arrest warrant issued in his name on September 21, 2013. (N.T. Volume 3, 06/19/2015, p. 84). She noted that they both were "understandably upset and both really shocked and surprised about it." (N.T. Volume 3, 06/19/2015, pp. 79-80).

Johnson acknowledged that she testified at the grand jury hearing on December 6, 2013.[5] Johnson stated that she first learned that the Defendant was still legally married to his wife on December 6, 2013, during the grand jury hearing. (N.T. Volume 3, 06/19/2015, pp. 72, 90).

She also stated that at some point, Detective Tim Bass and Detective George Pirrone knocked on the door of her mother's house when she was staying there. They were looking for the Defendant, whom they wanted to apprehend on an open murder warrant. (N.T. Volume 3, 06/19/2015, pp. 85-87).

Johnson was shown an exhibit of telephone records which reflected the telephone calls she had been exchanging with the Defendant on April 6 and 7, 2013. (N.T. Volume 3,

---

[5] Johnson stated that she was living in Atlanta at the time of the grand jury hearing on December 6th, 2013. (N.T. Volume 3, 06/19/2015, p. 90).

06/19/2015, pp. 94-101). She confirmed that she returned the Defendant's phone call at 12:48 pm when he told her, "I'm going to swing by." (N.T. Volume 3, 06/19/2015, p. 101). She also confirmed that the phone records did reflect that the two of them had an interaction at 2:54 am when he was at Theme's house in West Philadelphia from which location he called her and asked her to bring him his two phones. (N.T. Volume 3, 06/19/2015, p. 102). She also conceded that at the grand jury hearing she agreed that the Defendant was with her at 3229 North Bailey Street between 12:48 am and 2:54 am. (N.T. Volume 3, 06/19/2015, p. 111).

Johnson also confirmed that at the grand jury hearing, she provided the following answer in response to a question regarding how long the Defendant had been gone before she received the phone call at 2:54 am, "ANSWER: Enough for me to go to sleep. So I would say bare minimum 30 minutes." (N.T. Volume 3, 06/19/2015, pp. 112-13).

Johnson also attested that the following question-and-answer exchange occurred at the grand jury hearing:

> QUESTION: After he finished walking the dog a second time and before he left the house and leaving his phones in the house, what did the two of you do? ....
> ANSWER: Well, it was nighttime. We probably had sex and we talked. ...I was in my bed. That was pretty much it.

(N.T. Volume 3, 06/19/2015, p. 117).

Johnson remembered receiving a number of telephone calls from a blocked number on April 1, 2013. She stated that she did not know how the decedent had got her cell phone number. (N.T. Volume 3, 06/19/2015, p. 132).

Johnson stated that 'Ms. Molly' was her neighbor who lived on the opposite side of the street. (N.T. Volume 3, 06/19/2015, pp. 136-37). Johnson said that she "[didn't] know" whether the Defendant told her of the affidavit of probable cause for his arrest warrant which he received

20

within two days after his arrest on October 2, 2013. She also wasn't sure if the Defendant told her that the affidavit listed witnesses by numbers instead of names or that he wanted to find out who they were and if it was Ms. Molly. (N.T. Volume 3, 06/19/2015, p. 138). Johnson denied having cryptic phone conversations with the Defendant about Ms. Molly or about the Defendant's associates, though she conceded that she may have said to the Defendant on December 7, 2013, "Miss Molly is gone." (N.T. Volume 3, 06/19/2015, p. 140). She also agreed that on December 18, 2013, the case was continued because a witness did not show up in court. (N.T. Volume 3, 06/19/2015, p. 142).

Johnson agreed that on Saturday, after she testified before the grand jury, she was driving back down south and was on Route I-95 in Delaware or Maryland when the Defendant called her; they spoke on the phone for over an hour. (N.T. Volume 3, 06/19/2015, p.144). Johnson also confirmed that they were having an argument, with the Defendant saying that she failed to handle her job properly. She noted that as a result of that argument, she turned the car around and drove back up to Philadelphia. (N.T. Volume 3, 06/19/2015, p. 144). Johnson also agreed that having talked to "Ms. Molly," she was back on the road the very next morning. (N.T. Volume 3, 06/19/2015, p. 145).

Johnson denied that the plan was to make sure Ms. Molly did not come to court; she also denied that Ms. Molly was not a female. (N.T. Volume 3, 06/19/2015, p. 147). Johnson conceded, however, that when she came to see Ms. Molly a second time, she said to her that she was curious what people were saying about her "husband." (N.T. Volume 3, 06/19/2015, p. 188).

During cross-examination, Johnson was shown and recognized the Defendant's hoodie and LeBron James sneakers. She indicated, however, that they were at his Bailey Street place all the time and that she gave them to Investigator Felder about five days before the start of the trial.

21

She noted that the Defendant never asked her to throw those items away. (N.T. Volume 4, 06/22/2015, pp. 42-45).

Johnson also explained that the Defendant wanted her to bring the phones on April 7, 2013, because "his children were about to get on the road and ... their car had trouble, so ...[she] assumed that he wanted to ... make sure that everything was okay and you can't do that if you don't have your phone." (N.T. Volume 4, 06/22/2015, pp. 48-49).

Under redirect examination, Johnson acknowledged that this was the very first time that she provided the reason for bringing the phones to the Defendant on the morning of April 7, 2013; she did not remember explaining this reason to the detectives on May 29, 2013 or before the grand jury. (N.T. Volume 4, 06/22/2015, pp. 59-61).

Johnson denied that Ms. Molly was the only person that she could go to to get money for the Defendant's lawyer but conceded that Ms. Molly "would know other people." (N.T. Volume 4, 06/22/2015, p. 61).

Charles Bonner testified that the Defendant was his childhood friend. (N.T. Volume 4, 06/22/2015, p. 66). Bonner stated that on April 6th into April 7th, 2013, he and his friends, including the Defendant, attended a hair show at 3801 Market Street. (N.T. Volume 4, 06/22/2015, pp. 66-68). Bonner left around the same time as the Defendant; he dropped off the Defendant at his car. (N.T. Volume 4, 06/22/2015, pp. 69-70).[6] Bonner stated that he said to the Defendant that he needed "to see what's going on with the little chick I had in there," that he was going to call her, and that depending on what she had to say, he and the Defendant could later go to some other place to party. (N.T. Volume 4, 06/22/2015, p. 70).

---

[6] Initially, Bonner testified that he dropped off another friend, Zach, not the Defendant, at Zach's car and then went home. (N.T. Volume 4, 06/22/2015, p. 67).

22

Bonner noted that he last saw the Defendant outside the hair show entrance and that the Defendant did not tell him where he was going. (N.T. Volume 4, 06/22/2015, p. 71). Bonner indicated that "around about two-something" the following morning, April 7, 20123, when he was home alone, someone dropped the Defendant off at his house. (N.T. Volume 4, 06/22/2015, pp. 72-73). Bonner explained that upon arrival, the Defendant said, "... I [must] check my phone and see if my family ... made it home down south yet because they was [sic] on the road." (N.T. Volume 4, 06/22/2015, p. 74). Bonner noted that the Defendant then realized that he did not have his phones with him and requested Bonner's permission to use his phone. (N.T. Volume 4, 06/22/2015, p. 74). After he made a phone call, his "female friend" came over. (N.T. Volume 4, 06/22/2015, p. 75).

Bonner insisted that he was aware that the Defendant was going to come to his house that morning and that his arrival was, in fact, prearranged. (N.T. Volume 4, 06/22/2015, p. 75). He stated that the Defendant was his friend and that it was not "abnormal" for him to come to Bonner's house. (N.T. Volume 4, 06/22/2015, p. 76). Bonner did not remember what the Defendant was wearing that morning with the exception of the Defendant's Le Bron sneakers of "aqua color." (N.T. Volume 4, 06/22/2015, p. 76).

Bonner remembered how officers came to his house, handcuffed him, and took him to Homicide. (N.T. Volume 4, 06/22/2015, p. 77-78). Bonner recognized Officer Earl Tilghman as the officer who "came and locked [him] up." (N.T. Volume 4, 06/22/2015, p. 78). He acknowledged that he did not go voluntarily to Homicide. (N.T. Volume 4, 06/22/2015, p. 80). Bonner denied remembering that he told Officer Tilghman that he did not want to be dragged down because of the Defendant doing "something stupid." (N.T. Volume 4, 06/22/2015, p. 80).

23

Bonner confirmed that on June 6, 2013 he gave a statement to Detective Tolliver but stated that he did not remember telling Detective Tolliver that he was not really that close with the Defendant and that he, in fact, did not know why the Defendant just showed up at his house that morning. (N.T. Volume 4, 06/22/2015, pp. 81, 84).

Bonner was shown the statement that he gave to Detective Tolliver and he confirmed that he signed each of the four pages of the statement, put his signature underneath the photographs of the Defendant and a female, and signed the Statement of Adoption Attestation. (N.T. Volume 4, 06/22/2015, p. 85). Bonner denied reviewing his statement before signing it. (N.T. Volume 4, 06/22/2015, pp. 86-87).

Bonner conceded that he was in custody at the time of the Defendant's trial after pleading guilty to federal robbery and firearms charges.[7] (N.T. Volume 4, 06/22/2015, p. 89). Bonner denied that when he was brought to the District Attorney's office, he said, "Everything in my statement is true, I'm not taking no stand." (N.T. Volume 4, 06/22/2015, p. 91).

For the benefit of the jury, the District Attorney went through Bonner's statement question-by-question. Bonner confirmed that he said that he went to the show with his friend Zach and that he took Zach to his car afterwards, before returning home. (N.T. Volume 4, 06/22/2015, p. 101). He also confirmed that he identified the Defendant on a photograph and that he stated that he saw the Defendant at the hair show and then the Defendant came to his house early Sunday morning. (N.T. Volume 4, 06/22/2015, p. 102). He denied that the Defendant used his telephone to call a "chick." (N.T. Volume 4, 06/22/2015, pp. 103-04). Bonner confirmed that he identified the girl on a photograph as the female whom the Defendant brought

---

[7] Bonner indicated, however, that "they planted evidence on [him]." (N.T. Volume 4, 06/22/2015, p. 89). Bonner confirmed that he received a sentence of seven and a half (7 ½) years. (N.T. Volume 4, 06/22/2015, p. 90).

to his house. (N.T. Volume 4, 06/22/2015, pp. 104-05). He also confirmed that he said that he did not know the decedent. (N.T. Volume 4, 06/22/2015, p. 105).

Bonner acknowledged that he said that the Defendant was wearing LeBron James sneakers when he came to his house but denied saying that the Defendant was wearing a gray-hooded sweatshirt and jeans. He said that he, in fact said "I'm not really sure if he had the gray sweater on, but I know he had some gray jeans on." (N.T. Volume 4, 06/22/2015, p. 106).

Bonner confirmed saying that he did not see what car the Defendant was driving that night. (N.T. Volume 4, 06/22/2015, p. 106). When the District Attorney pointed out to him that in the statement, Bonner never mentioned that someone dropped the Defendant off and that the Defendant waved to somebody after he came into the house, Bonner noted that Detective Tolliver did not ask him about that. (N.T. Volume 4, 06/22/2015, p. 107).

Bonner denied saying that the Defendant told him that he was going home after the hair show. (N.T. Volume 4, 06/22/2015, p. 108).

Eric Wallace testified that he was inside his home on the 3200 block of North Bailey Street the morning of April 7, 2013. He was awakened by noise that morning: he heard someone outside arguing. When he got up and looked outside, he saw someone pass by. He could not see who it was because the trees were blocking the street lights; however, he noticed that the person was going up the street toward Willard Street. (N.T. Volume 4, 06/22/2015, pp. 145-50).

Wallace did not call police. He received a phone call in the morning and was informed that someone had been killed on the block. He noticed police on the block that morning. (N.T. Volume 4, 06/22/2015, pp. 150-51).

Wallace confirmed that sometime after the incident detectives came to his home to speak to him and that they took him down to the Roundhouse. He remembered giving a statement to

25

Detectives Tolliver and Spotwood on April 15, 2013. Wallace confirmed that each page of his statement contained his signature as did the page with some photographs as well as the Statement of Adoption Attestation.   He conceded that although he told the detectives that he was not under the influence of drugs or alcohol, he was on Percocet and chemo and was taking crack cocaine to help relieve his stress. (N.T. Volume 4, 06/22/2015, pp. 153, 155-57, 164-65).

Wallace confirmed that when asked by the detectives to describe in his own words what he saw, he stated:

> I heard an argument outside.  I was upstairs in my room.  I don't know what time it was.  I tried to look and see who was arguing, but I couldn't see who they were.  It was two people, a male and a female.  Then I heard gunshots and saw the male leaving.  He walked fast toward Willard Street. I stayed in my house.  About 8 a.m. in the morning, I saw the crime scene people out there.  The block was taped off.
> ....
> Then I heard gunshots and saw the male leaving.

(N.T. Volume 4, 06/22/2015, pp. 166, 168-69).

He denied, however, that what he said about the argument outside was true; he also denied hearing the gunshots or seeing the male walking toward Willard Street.  When reminded that before being shown the statement, he testified that he saw someone walking up toward Willard Street, he denied seeing anybody. (N.T. Volume 4, 06/22/2015, pp. 167-69).

While he confirmed that he did say in his statement that the male who walked away after he heard the gunshots was his "old neighbor, Tina's brother,"[8] he denied that it was true. (N.T. Volume 4, 06/22/2015, p. 170).   He also denied recognizing the Defendant on the photo array as "the male [he] saw walk away after hearing the gunshots." (N.T. Volume 4, 06/22/2015, p. 173).

---

[8] He confirmed that the Defendant was Tina's brother whom he had recognized in court. (N.T. Volume 4, 06/22/2015, p. 171).

26

Wallace confirmed that he did not see the male with a gun. He also confirmed that he said that the male was wearing a gray hooded sweatshirt, blue jeans, and sneakers and that although his hood was up, he could see the front of his face. (N.T. Volume 4, 06/22/2015, p. 1176). However, he denied that this was true and stated, "I didn't see nothing." (N.T. Volume 4, 06/22/2015, p. 176).

Wallace acknowledged that he said that he did not see the female who was shot. (N.T. Volume 4, 06/22/2015, p. 177). He confirmed that he said to the detectives that he did not call the police after he heard the gunshots because he "wanted to mind [his] business." (N.T. Volume 4, 06/22/2015, p. 180).

He confirmed that he gave permission to videotape the interview but noted that they did not ask for his consent before putting him on the video. (N.T. Volume 4, 06/22/2015, pp. 181-82, 184-85).[9]

Wallace remembered that he was subpoenaed for a court date on December 18, 2013, to testify in this case but that he did not appear in court on that day. He remembered that on December 23 he came to the District Attorney's office after he heard that a bench warrant had been issued. He also confirmed that he expressed concerns about testifying to the District Attorney. He confirmed that during the meeting with the District Attorney and Officer Jackson, he stated that everything in his statement on the video was true. (N.T. Volume 4, 06/22/2015, pp. 192-93, 223).

He also confirmed that on February 25, 2014, he testified at the preliminary hearing. (N.T. Volume 4, 06/22/2015, p. 193). For the benefit of the jury, his testimony at the preliminary hearing was read in court. (N.T. Volume 4, 06/22/2015, pp. 197-216).

---

[9] The video was played in court for the benefit of the jury. (N.T. Volume 4, 06/22/2015, pp. 185-91).

27

Wallace agreed that his testimony at the preliminary hearing was very similar to the statement he had made at Homicide. (N.T. Volume 4, 06/22/2015, p. 201).[10] One difference was that at the preliminary hearing he stated that the person he saw when he looked out his window was not the Defendant. (N.T. Volume 4, 06/22/2015, p. 211). He conceded, however, that during the December 2013 meeting with the District Attorney, he said that he "was not pointing the finger at nobody." (N.T. Volume 4, 06/22/2015, p. 225). When asked what he was fearful of, he responded that he was fearful of "the truth." (N.T. Volume 4, 06/22/2015, p. 225). He also confirmed that, when asked "What is the truth?" he noted "I didn't see nothing." (N.T. Volume 4, 06/22/2015, p. 225).[11]

Under cross-examination, Wallace stated that he had cancer and that on April 15th he had to wait for 8 hours at Homicide before being interviewed. During that period of time, he did not take Percocet, his pain medicine. (N.T. Volume 4, 06/22/2015, p. 231-33).

Police Officer Earl Tilghman testified that Detective Tolliver asked him to transport Bonner to Homicide if he could locate him. (N.T. Volume 1, 06/23/2015, p. 7). (Officer Tilghman knew Charles Bonner from an earlier time; when Bonner was 15 or 16 years old, he was one of the players on the youth basketball summer league team which Officer Tilghman coached.) (N.T. Volume 1, 06/23/2015, p. 6).

---

[10] However, during the preliminary hearing, Wallace indicated that he was not under the influence of any drugs or alcohol when he went down to Homicide to be interviewed on April 15, 2013. (N.T. Volume 4, 06/22/2015, p. 206). While he conceded that he, indeed, gave that answer at the preliminary hearing, he noted that he, in fact, was under the influence. (N.T. Volume 4, 06/22/2015, p. 206).

[11] Wallace confirmed that he also met with the defense investigator Felder and that the latter asked him questions for about 45 minutes before Wallace took the witness stand. (N.T. Volume 4, 06/22/2015, p. 226-28). Wallace denied that Felder brought up the words "rat" and "snitch" while talking to him. (N.T. Volume 4, 06/22/2015, p. 227). He then explained, "I was trying to answer his questions. .... I don't remember. I don't know." (N.T. Volume 4, 06/22/2015, p. 228).

Officer Tilghman and his partner, Officer Tameka Jackson, went to the address in West Philadelphia provided by Detective Tolliver and met with Bonner. (N.T. Volume 1, 06/23/2015, pp. 7-8). When Officer Tilghman told Bonner that Detective Tolliver was investigating the death of the Defendant's girlfriend and that he wanted to speak to him because his name came up in the investigation, Bonner responded, "I'm not getting dragged down in this bullshit because he did something stupid." (N.T. Volume 1, 06/23/2015, p. 9).

Officers Tilghman and Jackson then drove Bonner to the Homicide Division where he was interviewed by Detective Tolliver. They waited for Bonner at Homicide and transported him back home on completion of his statement. (N.T. Volume 1, 06/23/2015, pp. 10-11).

Officer Tilghman also confirmed that about two weeks prior to trial, at the request of the District Attorney, he and Police Officer Leon Telesford transported Bonner, who was in custody at that point, to the District Attorney's Office for a meeting. (N.T. Volume 1, 06/23/2015, p. 12). Officer Tilghman stated that Bonner was very "hostile" when brought into the District Attorney's office:

> He said he didn't want no part of this. He wasn't getting up on the stand, putting nobody in jail. You had his statement, everything in the statement is true, if you want to use the statement you can use the statement. He wasn't getting up on the stand. If you wanted him up on the stand, the sheriffs were going to have to beat his [expletive] and drag him up on the witness stand.

(N.T. Volume 1, 06/23/2015, p. 13).

Detective Brian Peters testified that he was working in the early morning hours of April 7, 2013, when the Homicide Division was notified of the death of a female. (N.T. Volume 1, 06/23/2015, pp. 24-25). Detective Peters went to the crime scene with Detective Glenn (first name not given). (N.T. Volume 1, 06/23/2015, p. 25). When they arrived, uniformed personnel were already on location, and crime scene officers were processing the scene.

Detective Peters indicated that they located some evidence in the street, including projectiles and fired cartridge casings (FCCs). A pair of car keys was also found near the body. (N.T. Volume 1, 06/23/2015, p. 26).

Detective Peters also noted that as part of processing the scene, they knocked on doors to perform "neighborhood surveys." (N.T. Volume 1, 06/23/2015, p. 27). They did surveys on both sides of the block as well as on some part of Allegheny and Willard streets. (N.T. Volume 1, 06/23/2015, pp. 27-29).

Detective Peters confirmed that at that time, he spoke with Lonnie Wilson and took a formal statement from him. (N.T. Volume 1, 06/23/2015, p. 29). He also spoke to Eric Wallace, who denied saying anything. (N.T. Volume 1, 06/23/2015, p. 29).

Detective Peters explained that they were trying to locate the decedent's vehicle; they succeeded in finding it about 75 yards west of the body. (N.T. Volume 1, 06/23/2015, p. 30). After opening the car door, they found and recovered the decedent's cell phone on a car seat. (N.T. Volume 1, 06/23/2015, p. 31).

Upon leaving the crime scene, they went to the decedent's home and spoke with the decedent's son Myzeh Jessie; they asked him for the phone's pass code which he was able to provide. (N.T. Volume 1, 06/23/2015, p. 32).[12]

Detective Peters stated that thereafter, he gave the decedent's telephone to Detective Tolliver. (N.T. Volume 1, 06/23/2015, p. 33). The telephone was eventually placed on a Philadelphia Police Department Property Receipt No. 3127429. (N.T. Volume 1, 06/23/2015, p. 34).

---

[12] While they were at the home, they did not make an official notification as they were not sure of the identity of the deceased person at that time and were not going to give that information to a juvenile. (N.T. Volume 1, 06/23/2015, p. 33).

Detective Timothy Bass explained that as a member of the fugitive squad within the Homicide Division, on September 17, 2013, he and his partner, Detective George Pirrone, were assigned to apprehend the Defendant. They were provided with an arrest warrant and a fugitive package by Detective Tolliver who was the assigned detective in this case. (N.T. Volume 1, 06/23/2015, pp. 45-46, 50).

Detective Bass explained that on September 18, 2013, he and Detective Pirrone went to an address of record for the Defendant in Pottstown, Pennsylvania. When they arrived, the property was vacant and there was a rental sign on the front of the property. They received information that it was under a lease with new tenants. (N.T. Volume 1, 06/23/2015, p. 51).

Thereafter, they established another possible address, in South Carolina, and that information was forwarded to the FBI Federal Violent Crimes Task Force. Once they learned that the Defendant may have moved to South Carolina, they sent an agent there; however, the Defendant could not be found at the South Carolina address. (N.T. Volume 1, 06/23/2015, pp. 51-53).

Detective Bass noted that on September 30, 2013, he and his partner went to a location in the 15th Street and Temple University area where they made contact with Femi-Ama Johnson. After Detectives Bass and Pirrone introduced themselves, Johnson acknowledged that she knew why they were there. She told them she had not spoken to the Defendant for over a week and that she had not seen him in some time. She indicated that she would not provide his phone number but explained that when he called her, his number came up blocked. (N.T. Volume 1, 06/23/2015, pp. 56-59).

When Detective Bass asked her if they could check her house for the Defendant's whereabouts, she consulted with her attorney, Raymond Driscoll, by phone, and that the latter

31

gave them permission to proceed inside. However, they did not find the Defendant. (N.T. Volume 1, 06/23/2015, pp. 60, 62).

On October 2, 2013, they were notified through the Defendant's attorney that the Defendant was about to come in to surrender. Detectives Bass and Pirrone processed the Defendant's arrest at 7:30 when he came to the front door of the Police Administration Building with his counsel. (N.T. Volume 1, 06/23/2015, pp. 66-68).

Marcella Jones testified that Eric Wallace was her friend of over 30 years. She confirmed that Wallace told her that he had seen a homicide; however, she noted that she stopped him when he was about to give her the details as she did not want to hear anything about it. (N.T. Volume 1, 06/23/2015, pp. 137-38). She believed that the homicide happened on his block.

According to Jones, Wallace told her that he was scared for his life because he was a witness. She indicated that she and Wallace had this conversation about a year before the trial. (N.T. Volume 1, 06/23/2015, p. 138).

Naneke Green testified that she was the decedent's cousin. She knew the Defendant as someone the decedent was dating. Green testified that in the afternoon of April 7, 2013, she drove to the decedent's place; on the way there, she called the Defendant and had a conversation with him.[13] The Defendant told her that he was on his way to the decedent's home. He told her that he had just found out about the decedent's murder and that he did not see her the previous day and did not know why she would be on Bailey Street. (N.T. Volume 1, 06/23/2015, pp. 142-43).

Green testified that when she arrived at the decedent's home, she had a chance to talk to the Defendant, who was already there. (N.T. Volume 1, 06/23/2015, p. 145). Green noted that

---

[13] Green indicated that she also tried calling him, unsuccessfully, earlier that day. (N.T. Volume 1, 06/23/2015, p. 143).

32

when she asked the Defendant whether he had seen the decedent the previous day, the Defendant stated:

> We were going through it, to be honest. I effed up. ...I was talking to somebody and I lied to her. She found out. I wasn't around, though. I went to a fashion show at 3801 then I went to the 7-Eleven. **Then I got a hotel room.** I didn't want to be around it.

(N.T. Volume 1, 06/23/2015, pp. 145-46) (emphasis added).

Green explained that she understood that he went to a hotel because he had lied to the decedent about a female staying at the house. The Defendant told Green that he was going to talk to the detectives. (N.T. Volume 1, 06/23/2015, pp. 146-47).

Detective Edward Tolliver testified that he was the assigned detective in this case and that on April 7, 2013, he and his partner at the time, Detective Spotwood, interviewed witnesses, including Freddie Brown who was the first person to be brought down to Homicide. (N.T. Volume 1, 06/24/2015, pp. 18-20).

Detective Tolliver stated that on April 7, 2013, the decedent's cell phone retrieved from the decedent's car was turned over to him; eventually, he and Detective Spotwood made their way to the decedent's home and talked to the family. (N.T. Volume 1, 06/24/2015, pp. 22, 27).

Detective Tolliver indicated that while he was still at the headquarters that afternoon, he had a chance to talk to the Defendant on the phone. Detective Tolliver explained to the Defendant that he was investigating the decedent's homicide, that he understood that the decedent and the Defendant were romantically involved, and that he just wanted to speak to the Defendant as part of the investigation. Thereafter, the Defendant agreed to come to Homicide and obtained the address from Detective Tolliver. They waited for him for a few hours; however, he never showed up. Detective Tolliver called him back but the Defendant never answered the phone. (N.T. Volume 1, 06/24/2015, pp. 22-23).

33

Detective Tolliver noted that they also talked to Erica Burton and her mother on April 7, 2013. On April 9, 2013, the decedent's siblings, Priscilla Jessie and Aiking Jessie came in and provided statements. (N.T. Volume 1, 06/24/2015, p. 24).

Detective Tolliver indicated that he received neighborhood surveys from Detectives Peters and Glenn. He also noted that he and Detective Spotwood went back to the block numerous times to canvass the neighborhood and to do their own surveys as well; they talked to about a dozen people. (N.T. Volume 1, 06/24/2015, pp. 26-27).

On April 9, 2013, Detective Tolliver obtained a search warrant for the contents of the decedent's cell phone and for the phone records. Detective Tolliver explained that the other two search warrants were for cell phone records of two target cell phone numbers associated with Sprint and AT&T, respectively. Based on the information he obtained through executing those search warrants, he then applied for other search warrants for additional phone numbers. Later in April, Detective Tolliver received an extraction report for the phone's contents through the Regional Computer Forensics Laboratory. (N.T. Volume 1, 06/24/2015, pp. 27-31).

On April 15, 2013, Detectives Tolliver and Spotwood met Eric Wallace, whom they identified as a potential witness in the case. They knocked on his door, talked to him inside his home, and secured his agreement to come to Homicide and talk to the detectives. (N.T. Volume 1, 06/24/2015, pp. 31-32).

Detective Tolliver noted that while Wallace informed them that he had cancer, he assured the detectives that he would be fine without taking his medications with him. (N.T. Volume 1, 06/24/2015, p. 35).

Wallace told the detectives that prior to hearing gunshots, he heard an argument between a male and a female. He then went to the window and only saw a male who was walking off east

34

on Willard Street. Subsequently he said that he recognized the person; however, he was scared and did not want to identify him. (N.T. Volume 1, 06/24/2015, pp. 36-37).

Detective Tolliver said that he and Wallace had lunch together and talked about a lot of different things - life, family friends, and the neighborhood; after the interview was memorialized, Wallace agreed to be videotaped and then left. (N.T. Volume 1, 06/24/2015, pp. 37-40).

Detective Tolliver noted that Wallace identified the Defendant on a photo array of eight males. Wallace explained to the detectives that he was introduced to the Defendant by his sister Tina, who used to live two doors away from Wallace two years earlier. Detective Tolliver indicated that at no point did Wallace say that he needed any medication or that he needed to leave the interview room; he never refused to sign anything and willingly agreed to be videotaped. (N.T. Volume 1, 06/24/2015, pp. 46-47, 55).

Detective Tolliver confirmed that despite being subpoenaed to appear at the preliminary hearing on December 18, 2013, Wallace never did so. Although Detectives Griffin and Centeno were searching for him, they were unable to locate him. (N.T. Volume 1, 06/24/2015, p. 57).

Detective Tolliver also noted that on February 25, 2014, Detective Centeno picked up Wallace and brought him to court for a preliminary hearing. Prior to taking the witness stand that morning, Wallace told Detective Tolliver that "people don't want him to testify." Detective Tolliver offered to move Wallace if he felt that he was in any danger but Wallace never took advantage of those offers. Detective Tolliver noted that Wallace told him that he was threatened but he never mentioned who had threatened him. (N.T. Volume 1, 06/24/2015, pp. 57-58).

Detective Tolliver confirmed that he had applied for multiple search warrants to access cell phone records for the decedent's iphone and for other target phone numbers associated with

35

this case. He acknowledged that he received the Regional Computer Forensic Laboratory (RCFL) extraction report for the decedent's phone and looked through the contents of the phone, and that he also looked at the messages from the phones belonging to the Defendant; he noted the abundance of text messages. (N.T. Volume 1, 06/24/2015, pp. 63-65; 67-72).

Detective Tolliver also confirmed that he looked at each frame of a surveillance video from a store on the corner of Bailey Street and Allegheny Avenue. The video from the afternoon of Saturday, April 6, 2013, showed the decedent driving up on Bailey Street in her car, parking her car, getting out of the car, and walking north on Bailey Street while talking on a cell phone, then coming back to the car and taking off. Approximately a half-hour later, the video showed the Defendant walking south on Bailey Street, going inside the store, leaving the store, and proceeding to go east on Allegheny Avenue. The cell phone records showed that starting at 4:13 pm, during the time period observed on the video, several phone calls were made from the decedent's cell phone to the Defendant's cell phone. (N.T. Volume 1, 06/24/2015, pp. 74, 77-79, 82-83).

For the benefit of the jury, Detective Tolliver went through the text messages exchanged between the decedent and the Defendant over a period of time. (N.T. Volume 1, 06/24/2015, pp. 88-102; N.T. Volume 1, 06/25/2015, pp. 26-34, 37).

Detective Tolliver explained that as the next step of their investigation, he and Detective Spotwood tracked down Femi Johnson, who was staying at the Defendant's place on North Bailey Street. Unable to locate her at the residence, they found out where she worked; on May 29, 2013, Detectives Tolliver and Spotwood went to the school in Southwest Philadelphia where Johnson was a teacher. (N.T. Volume 1, 06/25/2015, p. 37).

36

When Detectives Tolliver and Spotwood explained the reason of their visit to Johnson, she produced a business card of an attorney, Dennis Cogan (she explained that she had received the card from the Defendant). (N.T. Volume 1, 06/25/2015, p. 40). The detectives told her that she had the right to have an attorney but that they were "just investigating a homicide that happened two doors away from [her] house" and wanted to talk to her to find out if she knew anything. (N.T. Volume 1, 06/25/2015, p. 41).

Detective Tolliver stated that Johnson, who was never a suspect, agreed to go to Homicide where they took an interview from her. (N.T. Volume 1, 06/25/2015, pp. 41-42). Detective Tolliver noted that Johnson was "very vague, very evasive" when answering all of the detectives' questions. (N.T. Volume 1, 06/25/2015, p. 42). She confirmed that she was at home at the time of the shooting and that she transported the Defendant's phones to the Defendant early in the morning. (N.T. Volume 1, 06/25/2015, p. 45).

Detective Tolliver also noted that guns can be disposed of easily and that in his experience as a detective and police officer it was rare that guns could be retrieved after some time had passed. After talking to his supervisors and his partner, they decided against serving a search warrant at the North Bailey location: "[W]e felt like we would be tipping our hand a little bit if we served a search warrant, especially at this location...." (N.T. Volume 1, 06/25/2015, pp. 49-50). He was also waiting for the Defendant to follow up on his promise to come in and talk to Detective Tolliver. (N.T. Volume 1, 06/25/2015, p. 50).

In her statement, Johnson identified Charles Bonner, in addition to the Defendant and the decedent. After receiving Johnson's statement, Detectives Tolliver and Spotwood found out Bonner's whereabouts, and on June 6, 2013, they brought him into Homicide for an interview. (N.T. Volume 1, 06/25/2015, pp. 50-52).

37

Detective Tolliver noted that Bonner, who was cooperative, mentioned that he and the Defendant had attended a hair show together on April 6th and that around 2:00 am on April 7, 2013, the Defendant arrived at his house. He indicated that shortly thereafter, the Defendant's acquaintance, a girl, came to the house with his two phones which he had left at his residence. (N.T. Volume 1, 06/25/2015, pp. 53-65).

Detective Tolliver stated that about a week or two after their initial encounter with Johnson, he and Detective Spotwood returned to her house. She was at home and after they told her that they wanted to talk to her again at Homicide, she refused to go with them; instead, she provided them with the name of her attorney, Raymond Driscoll. Following that encounter with Johnson, they reached out to Mr. Driscoll; they had no further conversations with Johnson, but a grand jury investigation was conducted. (N.T. Volume 1, 06/25/2015, pp. 66-69).

Detective Tolliver explained that they executed search warrants on Johnson's phones. He also indicated that following the receipt of the alibi notice filed by defense counsel on May 8, 2015, he arranged additional search warrants – for AT&T and Sprint for phone numbers belonging to the Defendant and for the phone records of Nekeisha Gay-McGriff, the Defendant's wife. (N.T. Volume 1, 06/25/2015, pp. 69, 81-83). Detective Tolliver also sent search warrants to Facebook for Instagram accounts. (N.T. Volume 1, 06/25/2015, pp. 86-87).[14]

Detective James Dunlap testified that he was called upon by Detective Tolliver to retrieve certain video surveillance in this case and that he was able to obtain video surveillance from a

---

[14] The Instagram accounts were tagged on the bottom of the photograph of the screen shot provided by Ms. Jessie, the decedent's sister. (N.T. Volume 1, 06/25/2015, pp. 86-87).

store at the northeast corner of North Bailey and Allegheny Streets. (N.T. Volume 1, 06/25/2015, pp. 163-66).[15]

Detective Dunlap also noted that a week or two after the incident, he was asked to take a look at the decedent's phone. (N.T. Volume 1, 06/25/2015, p. 168). There were seven pictures on that phone which were brought to his attention. "...I explained the time they were taken and the actual longitude and latitude of where they were taken." (N.T. Volume 1, 06/25/2015, p. 168). He took the phone to a private company, Cornerstone Forensic, and they performed an extraction and provided Detective Dunlap with a copy of their extraction work. (N.T. Volume 1, 06/25/2015, p. 169).

Detective Dunlap compared the photographs which he had against the photographs from the extraction, and found that they were exactly the same; he was able to see when the images were taken, down to a second. (N.T. Volume 1, 06/25/2015, p. 169).

For the benefit of the jury, Detective Dunlap reviewed the photographs and their metadata. The photographs were taken on the 3200 Block of Bailey Street and its vicinity. The data was consistent with both the extraction done by the Regional Criminal Forensic Laboratories of the FBI as well as by Cornerstone Forensics. (N.T. Volume 1, 06/25/2015, pp. 174-76, 181).

One of the photographs showed a piece of mail addressed to "Femi Johnson or current resident, 3229 North Bailey Street, Philadelphia, PA 19129." (N.T. Volume 1, 06/25/2015, p. 175). There were also photographs of a silver Mercedes taken on April 1, 2013, at 3:45 am. (N.T. Volume 1, 06/25/2015, pp. 176-79). Detective Dunlap stated that the car had a Pennsylvania tag, which enabled him to perform the BMV check; the check established that the

---

[15] Detective Dunlap explained that they had ten working cameras, including two exterior cameras, and that he succeeded in offloading those cameras. (N.T. Volume 1, 06/25/2015, p. 166).

Defendant was the owner of the vehicle. (N.T. Volume 1, 06/25/2015, p. 178). The decedent took her last photograph on her cell phone on April 7, 2013, at 2:23 am, around the corner from Bailey Street. (N.T. Volume 1, 06/25/2015, p. 180).

Detective Dunlap also shared his presentation report which showed the Defendant's and Johnson's color-coded phone records reflecting who was calling whom, what time, and from what location. (N.T. Volume 1, 06/25/2015, pp. 181-82).

Johnson received a phone call from the Defendant at 2:54 am on April 7 from the 3229 Bailey Street to 5332 Poplar Street location. (N.T. Volume 1, 06/25/2015, p. 183). Detective Dunlap explained that, according to Google Maps, the distance between those two locations was 6.4 miles. It took about 16 minutes to get to the Poplar Street location, meaning that the start of the travel time was roughly at 2:38 am. (N.T. Volume 1, 06/25/2015, p. 184).

Detective Dunlap also mentioned that after taking a photograph of the envelope with Johnson's name on it, the decedent made multiple phone calls to Johnson blocking her phone number ahead of making those calls. (N.T. Volume 1, 06/25/2015, pp. 187-92).

Nekeisha Gay-McGriff testified for the defense as an alibi witness. She stated that she and the Defendant were married for nine years and that they had two minor children. (N.T. Volume 1, 06/26/2015, p. 32). She explained that they lived in Columbia, South Carolina, where they moved in order to raise their children and start a business. (N.T. Volume 1, 06/26/2015, p. 33).[16]

Gay-McGriff indicated that on April 5, 2013, she drove with her two daughters to Philadelphia to visit her mother. She initially stated that the Defendant usually stayed at Bailey Street when they were visiting and that he probably stayed there that time as well, and not at her

---

[16] Gay-McGriff conceded that they did not start any business there. (N.T. Volume 1, 06/26/2015, p. 33).

40

mother's house; moments later, however, she stated that she believed that the Defendant, in fact, spent the night with her on April 5. (N.T. Volume 1, 06/26/2015, pp. 35-36).

Gay-McGriff stated that on April 6th, they went to visit the Defendant's mother. The Defendant drove the family there in Gay-McGriff's truck. (N.T. Volume 1, 06/26/2015, p. 37). Gay-McGriff noted that she spent the afternoon with her family but that the Defendant was out and she was not sure what he was doing. Gay-McGriff had a problem with the truck which she stated was leaking oil. The Defendant "got the car fixed before [they] got on the road." (N.T. Volume 1, 06/26/2015, pp. 38-39).

Gay-McGriff noted that the Defendant picked them up from his mother's house at about 5 or 5:30 pm and dropped them off at her mother's house at about 6:30 or 7 pm. (N.T. Volume 1, 06/26/2015, p. 39). Gay-McGriff explained that they needed to get some rest and finish packing to be able to get on the road at about 1:00 am. (N.T. Volume 1, 06/26/2015, p. 40).[17]

Gay-McGriff indicated that the Defendant contacted her again by phone at about 12:30 am; he asked her if she was ready to get on the road. He called her about ten minutes later to inform her that he had arrived. (N.T. Volume 1, 06/26/2015, pp. 42-43).

Gay-McGriff stated that although the Defendant was not drunk, she could smell alcohol on his breath. Having concluded that it would be unsafe for the Defendant to drive, she sat at the wheel and dropped the Defendant off on Bailey Street. (N.T. Volume 1, 06/26/2015, p. 47).[18] On the way there, he said that he was going to walk the dog and freshen up and go out with some friends. (N.T. Volume 1, 06/26/2015, p. 47).

---

[17] She explained that she wanted to leave that night so that her older daughter could have some rest on Sunday before returning to school on Monday. (N.T. Volume 1, 06/26/2015, p. 40).
[18] Gay-McGriff stated that she was unaware if anyone was staying at that address. (N.T. Volume 1, 06/26/2015, p. 47).

41

Gay-McGriff explained that she stopped at a gas station; she then went inside the mini mart and she called the Defendant (who, according to her, was sitting with their children in the car) to see if he wanted anything from the mini mart. (N.T. Volume 1, 06/26/2015, p. 48). She then returned to Bailey Street; she parked at 26th Street closer to Willard Street not on Bailey Street because "it's only one-side parking and there's never any parking." (N.T. Volume 1, 06/26/2015, p. 50). The Defendant came back to the car in about 15 to 20 minutes; she did not observe any difference in his demeanor; there were no scratch marks on him and no blood on his clothes. (N.T. Volume 1, 06/26/2015, pp. 50-51).

She gave the Defendant a ride, which took about 15 minutes; she recalled that they arrived in West Philadelphia but she did not know the name of the friend the Defendant was visiting. Gay-McGriff stated that she had never met Charles Bonner and that she did not see him that night; she just dropped off the Defendant then proceeded to get on the road to South Carolina. (N.T. Volume 1, 06/26/2015, pp. 51-52).

Under cross-examination, Gay-McGriff noted that while she did not know the decedent personally, she knew of her from the Defendant who informed Gay-McGriff when they were separated that he and the decedent were in a relationship. (N.T. Volume 1, 06/26/2015, p. 55). (Gay-McGriff and the Defendant were separated for about a year.)

Gay-McGriff was already in South Carolina when the Defendnat informed her that the decedent was killed. Gay-McGriff learned that the Defenant was a suspect in this murder when FBI agents came to the house. The Defendant did not tell her that he was a suspect but told her that he was asked to come down and speak to the detectives. She stated that she did not give the FBI agents his phone number but that she said that she would relay to him their message that there was a warrant out for his arrest. (N.T. Volume 1, 06/26/2015, pp. 56, 58-59).

Gay-McGriff stated that she never contacted police to tell them that she was with the Defendant that night; she explained that she wanted to talk to her lawyer first. She confirmed that she had a degree in criminal justice and that she had worked in the criminal justice system for almost a decade. (N.T. Volume 1, 06/26/2015, pp. 61, 65). Gay-McGriff confirmed that no one asked her to take a signed statement about her whereabouts for the day. (N.T. Volume 1, 06/26/2015, p. 66).

Ronald Felder testified that he was a licensed private investigator and that he had been working on this case for about a month. One of the pieces of discovery he reviewed was a surveillance video from a store on the corner of Bailey and Allegheny Streets. Specifically, he looked at a segment provided in discovery from 12:00 am to 3:00 am from both of the camera angles. For the benefit of the jury, Investigator Felder commented on the video. He noted that at about 1:57 am the video showed a male wearing a gray hoodie, black or dark sweat pants and dark-colored sneakers or shoes. At about 2:27 am, the video showed the same male who was starting to walk on the west side of Bailey Street toward Allegheny Avenue. (N.T. Volume 1, 06/26/2015, pp. 115-124, 129).

Agent Robert Waizenhofer testified that he was a special agent for the FBI and that he was assigned to the State of South Carolina. (N.T. Volume 1, 06/29/2015, p. 6). Agent Waizenhofer stated that on September 20, 2013, he received an assignment to go to a home in Columbia, South Carolina, to search for a fugitive by the name of Rudolph McGriff. (N.T. Volume 1, 06/29/2015, p. 7).

The Defendant's wife was at her residence when he and other agents arrived. Initially, she was reluctant to let them in but eventually she complied. They did not find the Defendant at the residence; Gay-McGriff explained to the agents that she had not seen him in two to three

43

months but that she believed that he was in Pennsylvania. She told them that she did not have any contact number for him and that she had no idea what car he was driving.

*Expert Testimony*

### Testimony of William Shute, an Expert in the Field of Historical Cell Site Analysis and Geolocation

Special Agent William Shute of the FBI Cellular Analysis Survey Team testified as an expert in the field of historical cell site analysis and geolocation. (N.T. Volume 1, 06/23/2015, pp. 76-85).

Agent Shute testified that he was provided records in this case and was asked to plot the geolocation of phone calls of Ms. Johnson and the Defendant during a certain time period and that he did that along with Detective James Dunlap of the Philadelphia Police Department Homicide Unit. (N.T. Volume 1, 06/23/2015, pp. 85-86).

Agent Shute explained, *inter alia*, that phone calls were made from one of the Defendant's phones on April 7, 2013, at 1:13 am and at 1:14 am, in the vicinity close to the crime scene. (N.T. Volume 1, 06/23/2015, p. 105). At that time, "the phone has moved towards the east in the vicinity just outside of the coverage area -- of Bailey Street." (N.T. Volume 1, 06/23/2015, p. 106).

Agent Shute also discussed a routed phone call which was made to one of the Defendant's phones, at 3:15 am, after the crime. At that time, the phone had moved away from the vicinity of Bailey Street, as well as North Philadelphia, all of which was consistent with Johnson driving with the Defendant's phones from Bailey Street to West Philadelphia. (N.T. Volume 1, 06/23/2015, p. 109). Agent Shute mentioned that altogether, there were

44

approximately 28 calls placed between 5:52 am and 2:40 pm in the vicinity of 5532 Poplar Street.

Agent Shute also testified that on April 7, 2013, between 12:48 am and 2:56 am, Johnson's Verizon target cell phone logged three phone calls. (N.T. Volume 1, 06/23/2015, pp. 114-15). All three phone calls covered 3229 North Bailey Street and were consistent with Johnson's being inside the house at the recorded times. (N.T. Volume 1, 06/23/2015, pp. 115-16).

Agent Shute confirmed that the testimony in this case was consistent with geolocation analysis. Specifically, at 2:54 am Johnson received a phone call from the Defendant utilizing a phone number which was identified as Charles Bonner's phone at 5532 Poplar Street. She did not answer that call; she picked up the next call from the same phone at 2:56 am, remained on the line for over 10 minutes, then took his phones out of the house, got in her car and drove top Bonner's house at Poplar Street (N.T. Volume 1, 06/23/2015, pp. 116-17).

While Johnson testified in this case that the Defendnat had moved to South Carolina approximately two months prior to the murder and was visiting Philadelphia only occasionally, based on Agent Shute's statistical analysis, the Defenant's phones were in the South about 3.75%-4% of the time, whereas over 94% of the time the phones were in the Philadelphia area. (N.T. Volume 1, 06/23/2015, pp. 123-24).

### Testimony of Dr. Albert Chu, an Expert in the Field of Forensic Pathology

Dr. Albert Chu, the Deputy Chief Medical Examiner for the City and County of Philadelphia, testified as an expert in the field of forensic pathology. Dr. Chu stated that the autopsy on the decedent in this case was performed by Dr. W. Ashton Ennis, who had since

45

resigned; Dr. Chu reviewed the case file, Dr. Ennis' findings as well as all the photographs which were taken at the time of the autopsy to prepare for his testimony.

The decedent, Malisha Jessie, was pronounced dead by emergency services at 3225 North Bailey Street in Philadelphia on April 7, 2013, at 7:25 am. (N.T. Volume 1, 06/23/2015, p. 156, 158-59).

Dr. Chu stated that the decedent suffered three gunshot wounds – two to the head and one to the chest. (N.T. Volume 1, 06/23/2015, p. 160). Dr. Chu indicated that one wound was to the left of the decedent's head; it was a perforating wound which exited next to her right eyebrow. (N.T. Volume 1, 06/23/2015, pp. 161, 163). The bullet penetrated the skull and went through the brain and the bones around the right eye. Dr. Chu stated that the decedent "would have been immediately unconscious if not dead from that wound." (N.T. Volume 1, 06/23/2015, p. 163). The gunshot wound would have likely been lethal. (N.T. Volume 1, 06/23/2015, p. 165)

Dr. Chu further explained that another bullet entered the left cheek and exited the right side of the neck. (N.T. Volume 1, 06/23/2015, p. 163). The bullet fractured some of the facial bones as well as the first two vertebrae or bones of the spine; it also injured the spinal cord in that corresponding region before exiting the body. (N.T. Volume 1, 06/23/2015, p. 164). Dr. Chu explained that that bullet would have caused almost immediate death. (N.T. Volume 1, 06/23/2015, p. 164). Dr. Chu also noted that based on the stippling and soot around the decedent's left cheek, he could conclude to a reasonable degree of scientific certainty that the shot to her left cheek was a close-range shot. (N.T. Volume 1, 06/23/2015, p. 170).

Finally, Dr. Chu indicated that a third gunshot wound entered the right side of the upper chest and exited near the right armpit; the wound went through the soft tissue underneath the skin. (N.T. Volume 1, 06/23/2015, p. 165).

46

Dr. Chu stated that there was a fragment of a bullet recovered from the gunshot wound that entered in front of the decedent's left ear; it was collected during the autopsy and submitted to the Philadelphia Police Department. (N.T. Volume 1, 06/23/2015, pp. 171-72).

Dr. Chu concluded to a reasonable degree of medical certainty that the decedent died as a result of multiple gunshot wounds, and that the manner of his death was homicide. (N.T. Volume 1, 06/23/2015, p. 173).

### Testimony of Police Officer Lawrence Flagler, an Expert in the Field of Firearm and Tool Marking Examination

Police Officer Lawrence Flagler testified as an expert in the field of firearm and tool marking examination. (N.T. Volume 1, 06/23/2015, p. 190). Officer Flagler explained that he received evidence in this case and placed it under a comparison microscope and generated a report with his findings; the report was peer-reviewed by another examiner. (N.T. Volume 1, 06/23/2015, p. 202).

Officer Flagler noted that three fired cartridge casings (FCCs) and two bullets were submitted to him by the Crime Scene Unit. (N.T. Volume 1, 06/23/2015, p. 206). He also received the lead fragment from the Medical Examiner's office. (N.T. Volume 1, 06/23/2015, p. 206).

After conducting the microscopic examination on the three FCCs, Officer Flagler concluded to a reasonable degree of scientific certainty that all three of the FCCs were fired from the same firearm. (N.T. Volume 1, 06/23/2015, p. 207).

Office Flagler also engaged in comparing the bullets but the results were inconclusive as he was unable to make an identification when comparing them to each other, because the markings left were insufficient and there was not enough correspondence to enable him to make

47

an identification. (N.T. Volume 1, 06/23/2015, p. 207). In addition, he was unable to compare a lead fragment; it was "unsuitable" for comparison as it did not exhibit any microscopic markings sufficient for an examination. (N.T. Volume 1, 06/23/2015, p. 209).

### *Stipulations*

It was stipulated by and between counsel that Charles Bonner was brought down from New York federal prison into local custody in Philadelphia on June 8, 2015.

The attorneys also stipulated to the contents of the prison visitor logs as they applied to documenting when Marquis Chappelle visited the defendant.

The attorneys further stipulated with regard to Sprint cell phone records for Gay-McGriff. Those records showed that the last phone call between Mrs. McGriff and the Defendant's phone occurred on September 20, 2013, at 1:47 p.m., and lasted for four minutes.

Finally, there was a stipulation to the fact that Sprint records as to text messages are set forth in Central Time and, therefore, have to be adjusted to conform to Eastern Time.

### *Self-Authenticating Document*

This court accepted as a self-authenticating document the Certificate of Non-Licensure issued by Pennsylvania State Police which stated that on the date of the incident, April 7, 2013, the Defendant, Rudloph McGriff, did not have a valid license to carry a firearm. (N.T. Volume 1, 06/26/2015, pp. 29-30).

48

## THIS COURT RIGHTFULLY PERMITTED THE COMMONWEALTH TO PRESENT EVIDENCE PERTAINING TO THE DEFENDANT'S NON-REPORTING TO HOMICIDE FOR QUESTIONING.

The Defendant claims that this court abused its discretion in permitting the prosecutor to present evidence that the Defendant had repeatedly declined to report to the Philadelphia Police Homicide Unit for questioning. The Defendant further claims that this court erred when it denied the defense a permission to present the testimony of Attorney Anthony Petrone who would have allegedly testified that he instructed the Defendant, his client, not to talk to the Homicide Unit detective. The Defendant insists that Attorney Petrone's testimony would have been crucial in rebutting the prosecutor's argument that the Defendant's refusal to do so reflected his consciousness of guilt. The Defendant avers that the trial court abused its discretion in ruling that, if called to the stand, Mr. Petrone could be questioned about the Defendant's previous criminal cases, which resulted in Mr. Petrone's not being called to testify. The Defendant's claims are without merit and must fail.

Under the law, a "mere reference to a defendant's silence does not necessarily impinge constitutional rights...." *Commonwealth v. Adams*, 104 A.3d 511, 517 (Pa. 2014). "[T]he right against self-incrimination is not burdened when the reference to silence is circumspect and does not create an inference of an admission of guilt." *Id.* (citation and internal quotations omitted). There is no reversible error where an explicit reference to silence "occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." *Id.* (citation omitted).

Prosecutors should "tread carefully when referencing a defendant's refusal to speak to officers, limiting such reference to the description of the investigation or other relevant purpose." *Id.* at 518 (holding that the reference to defendant's pre-arrest silence was contextual and "did

49

not highlight Defendant's silence as evidence of guilt"; instead, it was utilized "to recount the sequence of the investigation, in particular, how the DNA sample was obtained from Defendant").

The Fifth Amendment does not involve a "proscription precluding the raising of silence in fair response to defense argumentation." *Commonwealth v. DiNicola*, 581 Pa. 550, 560, 866 A.2d 329, 335 (2005) ("Since the trooper's investigation was obviously limited by [defendant's] decision to reject the request for an interview, we find that the Commonwealth's elicitation of the trooper's testimony regarding this fact constituted fair response."). For purposes of fair response, on an appropriate objection, admissibility is subject to the trial court's evaluation of probative value versus prejudicial effect under Pa.R.E. 403. *Id.* at 336.

### Detective Tolliver's Testimony Was Not Intended to Imply a Tacit Admission of Guilt By the Defendant.

The Defendant claims that this court abused its discretion by permitting the Commonwealth to present evidence of his non-reporting to the Homicide Unit for questioning. Upon careful review of the record, this court concludes that the Defendant's Fifth Amendment right against self-incrimination was not disturbed. No relief is due.

Here, on April 7, 2013, the day the decedent was killed, Detective Tolliver spoke with the Defendant on the phone and explained to him that he was investigating the homicide and that he would like to talk to the Defendant as part of gathering information. The Defendant, not a suspect at the time, promised that he would come to Homicide to speak to the detectives further. Almost immediately thereafter, the Defendant reached out to his counsel, Anthony Petrone, who advised him against speaking to anyone. (N.T. Volume 1, 06/4/2015, p. 10).

50

The Defendant, therefore, insists that he simply followed his counsel's advice, and that his Fifth Amendment rights were violated when his non-reporting to Homicide was brought to light through Detective Tolliver's trial testimony.

This court finds that in the case at bar, Detective Tolliver's testimony offered a reasonable explanation as to why a search warrant was not served on the Defendant in an attempt to locate the gun from which the fatal shots were fired. As the Commonwealth correctly noted, had a search warrant been served on the Defendant, the latter would have interpreted this circumstance as him being a suspect, which would have scared him away from talking to the detectives.

> [Detective Tolliver's] testimony came in, clearly, to rebut any allegations of ... lazy detective work and the credibility of Detective Tolliver, when he took the witness stand, as the defense attacked Detective Tolliver's credibility. Part of the attack on his credibility was the lack of serving a search warrant and the lack of his diligence. So it came in for that purpose and not to pierce [the Defendant's] Fifth Amendment right.

(N.T. Volume, 06/26/2015, pp. 9-10).

Furthermore, it was well known that the Defendant had a lot of properties, and it wouldn't have been obvious which property to search in the first place. The detectives were also aware that it was easy to dispose of the gun "right away." (N.T. Vollume 1, 06/24/2015, pp. 7-8).

Upon review of the record, this court is satisfied that the evidence that the Defendant did not follow through on his promise to come to Homicide to speak to the detectives did not imply any tacit admission of guilt by the Defendant as it was introduced with a sole purpose of demonstrating the nature and focus of the investigation. Through his trial testimony, Detective Tolliver, whose credibility was a "linchpin" in this case (N.T. Volume 1, 06/24/2015, p. 11),

51

offered a fair response to counter any defense allegations of his supposed lack of conscientiousness as an investigator. The reference to the Defendant's non-showing up at Homicide was circumspect and contextual; in no way did it create an inference of the Defendant's consciousness of guilt. This court, therefore, concludes that the Defendant's right against self-incrimination was not disturbed. No relief is due.

### This Court Did Not Abuse Its Discretion by Deciding to Give a Wide Latitude for Cross-Examination if Attorney Anthony Petrone Were Called to Testify.

This court is firmly of the belief that it correctly gave wide latitude for cross-examination if Attorney Petrone were called to testify. No relief is due.

Under the law, "cross-examination of a witness ... should be limited to the subject matter of the direct examination and matters affecting credibility, however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Pa.R.E. 611.

Our Supreme Court has set forth the following guiding principles pertaining to a challenge to the extent of cross-examination:

> [W]e note that in cross-examining a witness, an attorney is entitled to question the witness about subjects raised during direct examination as well as any facts tending to refute inferences arising from matters raised during direct testimony.... Similarly, an attorney may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony .... However, the scope and limits of cross-examination is [sic] vested in the trial court's discretion and that discretion will not be reversed unless the trial court has clearly abused its discretion or made an error of law.

*Commonwealth v. Begley*, 566 Pa. 239, 276-77, 780 A.2d 605, 627 (2001) (internal citations omitted).

52

In the case *sub judice*, defense counsel wanted Attorney Petrone to testify that he told the

Defendant that he was not to speak with anyone, "because he doesn't know anything about the

case, doesn't have the discovery." (N.T. Volume 1, 06/26/2015, p. 4).

The Commonwealth noted that Attorney Petrone's testimony would be irrelevant because

the reason this court admitted the Defendant's telephone conversation with Detective Tolliver

was to explain why the latter did not execute a search warrant on the Defendant's home. As the

prosecutor argued:

> "[T]his is basically the [D]efendant trying to testify without taking the
> witness stand, and it's not proper. It's not relevant. It doesn't rebut the
> fact that that is a reason why Detective Tolliver did not execute a search
> warrant on the Defendant's home. Furthermore, I should be able to cross-
> examine Mr. Petrone on why the [D]efendant reached out to him, the
> contents of the conversation, and ... on his credibility."

(N.T. Volume 1, 06/26/2015, p. 5).

This court agrees with the Commonwealth that where the defense was putting in play the

Defendant's right of silence, the Commonwealth had to be permitted to cross-examine the

attorney and argue on that issue. (N.T. Volume 1, 06/26/2015, p. 10). As the Commonwealth

explained, it would have been hard to sanitize the reason the Defendant had called Attorney

Petrone, whom he had known in connection with prior homicides with which he had been

charged. "[T]he reason why [the Defendant] had [Attorney Petrone's] phone number and the

relationship that he had with Mr. Petrone was because of prior murders." (N.T. Volume 1,

06/26/2015, p. 7).

Furthermore, defense counsel himself agreed with this court that the mere fact that

Attorney Petrone told the Defendant not to go to the police did not mean that that was, in fact,

the reason the Defendant did not go to the police: MR. DESIPIO: "Well, that's fair." THE

COURT: "All of that. ..... I think we're on the same page right now." (N.T. Volume 1, 06/26/2015, p. 13).

Having weighed how Attorney Petrone's testimony would impact the Defendant's case, defense counsel made a strategic decision not to call Petrone on the stand:

> MR. DESIPIO: And if Petrone does not testify, you're not going to argue in any form or imply or draw reasonable inference that his not going to the police when he told Tolliver he would is consciousnless of guilt or a lie or anything else, because that's not why you introduced it?
>
> MR. NOTARISTEFANO: That's correct.
>
> THE COURT: Okay. Then we're on the same page?
>
> MR. DESIPIO: I think we are.

(N.T. Volume 1, 06/26/2015, pp. 16-17).

Moreover, this court finds that Attorney Petrone's counseling the Defendant neither rebuts the fact that the Defendant lied to the decedent's family[19] nor rebuts the reason Detective Tolliver did not serve a search warrant.

---

[19] This court agrees with the Commonwealth that the Defendant displayed consciousness of guilt by misleading the family over the course of three weeks that he would go to the police:

> The defense will say that, well, he cared for her, so he wants to know, like everybody else that cares for her wants to know, do they have a suspect? Are they going to close the case? Are they going to solve who killed my loved one? But taken in context of, "Did you go to the police yet, did you go to the police yet," and he's saying to them for three weeks, "I will go to police," and then never does, kind of takes out of the context of, "I want to know if the police are solving this crime, who they have, my beloved has been brutally murdered and I'm grieving," to all of everything that I just said that can be interpreted one way or the other, put in context, shows no, I'm hiding, I have a guilty conscience.

(N.T. Volume 1, [motions] 06/17/2015, p. 16).

> Putting in this piece where he is clearly lying to them shows that those conversations should not be interpreted for innocence but should be interpreted for consciousness of guilt. It's the conversations about everything else, not so much him not going to police and hiding from police, but him saying that he will and then not doing it.

(N.T. Volume 1, 06/17/2015, p. 22).

54

This court, therefore, did not abuse its discretion when it made it clear that while it would permit Attorney Petrone to testify, the court would exercise its discretion and give a wide latitude for cross-examination. The Defendant's meritless claim must fail.

**THIS COURT DID NOT ERR IN REFUSING TO PERMIT THE DEFENSE TO CALL WITNESSES WHO WOULD TESTIFY THAT THE SLAYING OF THE DECEDENT MAY HAVE BEEN A RESPONSE TO HER PARTICIPATION IN A SCHEME TO COMMIT ARMED ROBBERIES ON BAILEY STREET; THIS COURT ALSO PROPERLY EXCLUDED EVIDENCE THAT A BB GUN WAS FOUND IN THE DECEDENT'S VEHICLE.**

The Defendant further argues that this court abused its discretion when it refused to admit evidence of a BB gun found in the decedent's vehicle. The Defendant also claims that this court erred when it denied permission to the defense to call Jamar Nesmith and Rasheeda Rogers who allegedly would have testified that the victim's shooting may have been a response to her participation in a scheme with Nesmith and Rogers to commit armed robberies of drug dealers on Bailey Street. The Defendant insists that he was thereby deprived of an opportunity to rebut the Commonwealth's argument that the victim was slain by the Defendant. The Defendant's claim is without merit and must fail.

### The BB Gun Found in the Decedent's Car Was Correctly Excluded.

This court correctly granted the Commonwealth's motion *in limine* to suppress evidence relating to a BB gun recovered in the decedent's vehicle.

Under Pennsylvania law, non-relevant evidence is not admissible. Pa.R.E. 402.

"[W]hile the general rule of the admissibility of relevant evidence is subject to various exceptions, **the rule that irrelevant evidence is not admissible is categorical.** Accordingly, the threshold inquiry with admission of evidence is whether the evidence is relevant."

*Commonwealth v. Cook*, 597 Pa. 572, 602, 952 A.2d 594, 612 (2008) (citation and internal quotations omitted) (emphasis added).

55

The Defendant averred that the BB gun was admissible because anything recovered from the decedent's car "was of value." (N.T. Volume 1, 06/23/2015, p. 178). The Commonwealth noted that the presence of the gun in the decedent's vehicle was not relevant in this case.

This court is satisfied that the evidentiary value of the gun's presence in the decedent's car was "less than insignificant."[20] (N.T. Volume 1, 06/23/2015, p. 179). This court, therefore, did not err in granting the Commonwealth's motion *in limine* with regard to the BB gun found in the decedent's car.

## This Court Correctly Refused to Permit the Defense to Call Jamar Nesmith and Rasheeda Rogers.

This court did not err when it refused to permit the defense to call Jamar Nesmith and Rasheeda Rogers to rebut the Commonwealth's argument that the victim was slain by the Defendant.

Pennsylvania Rules of Evidence state in pertinent part:

**(b) Crimes, Wrongs or Other Acts.**
*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Pa.R.E. 404 (b)(1).

Other crimes evidence is "admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident."

*Commonwealth v. Tyson*, 2015 PA Super 138, 119 A.3d 353, 358 appeal denied, 128 A.3d 220 (Pa. 2015).

---

[20] This court indicated, it would have permitted this evidence if there were a self-defense component to it but that that there was no self-defense involved in the present case. (N.T. Volume, 06/23/2015, p. 178).

Here, it was proffered that Jamar Nesmith (who resided at 3225 Bailey Street)[21] would testify that he, Rasheeda Rogers, and the decedent "would actually rob drug dealers and johns; that they would use a gun or something that looked like a gun to do so...." (N.T. Volume 1, 06/23/2015, p. 180). It was also proffered that Nesmith would testify that as a result of this activity, there was a contract hit on the victim.

Defense counsel was planning to argue that "if you are going to rob drug dealers and johns at 3225 Bailey Street right where [the decedent] was found, and that's where her body was found, that she was at 3225 for a different purpose other than to meet with [the Defendant]." (N.T. Volume 1, 06/17/2015, p. 41). The defense was thereby proffering this evidence to show that there was another reason the victim was on the block of Bailey Street and to explain why someone else would want to kill the decedent. (N.T. Volume 1, 06/17, 2015, pp. 30-31).

The Commonwealth pointed to the circumstance that there was no extrinsic evidence to corroborate the allegation of the decedent's involvement in prior robberies, that the evidence lacked foundation, and that as such, it was simply bad character evidence which was not proper under 404(b). (N.T. Volume 1, 06/17, 2015, p. 32).

Upon review of the record, this court concludes that the evidence indeed lacked proper foundation and was speculative. This court is also satisfied that the evidence, if admitted, would undeniably go to character assassination of the deceased. This court, therefore did not err in refusing to permit the defense to call witnesses Nesmith and Rogers.

---

[21] The Defendant's Bailey Street address was at 3229 Bailey Street.

## CONCLUSION

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.

58